**GULF, MOBILE AND OHIO RAILROAD COMPANY, a corporation, Plaintiff,**

v.

**ILLINOIS CENTRAL RAILROAD COMPANY, a corporation, Defendant.**

Civ. A. No. 6947.

United States District Court, N. D. Alabama, S. D.

Dec. 30, 1954.

Carl Fox and Y. D. Lott, Jr., of Mobile, Ala., E. L. All, Douglas Arant, and B. A. Monaghan of White, Bradley, Arant, All & Rose, Birmingham, Ala., for plaintiff.

John W. Freels, Charles A. Helsell and Harold E. Spencer, Chicago, Ill., and James R. Forman, Jr., of Burr, McKamy, Moore & Tate, Birmingham, Ala., for defendant.

GROOMS, District Judge.

This is an action under the Declaratory Judgment Act by Gulf, Mobile and Ohio Railroad Company. Title 28 U.S. C.A. § 2201. Plaintiff seeks a declaration of rights and relief from liability under a contract dated January 16, 1906. The contract was executed by the defendant, Illinois Central Railroad Company, its three wholly-owned subsidiaries, the Mississippi and Alabama Railroad Company, the Alabama Western Railroad Company, and the Jackson and Southeastern Railroad Company, and by the Southern Railway Company and its subsidiaries, Mobile and Ohio Railroad Company, and Northern Alabama Railway Company. The plaintiff will be herein referred to as G M & O, the Illinois Central as IC, Southern Railway Company as Southern, Mobile and Ohio as M & O, and Northern Alabama Railway Company as Northern Alabama. Under this contract, IC was granted joint use of M & O's approximately 51 miles of track from Perry, Tennessee, to Ruslor, Mississippi. M & O was granted joint use of approximately 80 miles of

track from Ruslor to Haleyville, Alabama. This track was to be constructed by the Mississippi and Alabama Railroad Company and the Alabama Western Railroad Company. This line was to connect with the Northern Alabama's line at Haleyville. IC was granted the joint use of Northern Alabama's approximately 41 miles of track from Haleyville to Jasper, Alabama. The several grants also included among other rights the use of passing tracks and switches, and the right to take water and coal from the water stations and coal chutes. IC had previously acquired trackage rights over the line of the St. Louis and San Francisco Railroad Company between Jasper and Birmingham. By other separate contracts, terminable on 90 days' notice, M & O acquired trackage rights over the Northern Alabama line between Haleyville and Parrish, Alabama, and over the line of the Southern between Parrish and Birmingham.

Under the terms of the 1906 contract, IC guaranteed the fulfillment of all the agreements and covenants made in the contract by the Mississippi and Alabama Railroad Company and the Alabama Western Railroad Company, and Southern made a like guarantee for M & O and Northern Alabama. The IC is the successor in interest of its former subsidiary companies, all of which have been dissolved. In 1939, Southern, following due authorization therefor, purchased the properties of Northern Alabama. Plaintiff purchased the assets of M & O at a mortgage foreclosure sale in 1940. Prior to said purchase, it was agreed between the plaintiff and the defendant that the former would become a party to the 1906 contract in the place of M & O. When the plaintiff succeeded to the rights of M & O, Southern was unwilling to continue the trackage arrangement over the Haleyville-Parrish-Birmingham tracks on the same basis that that operation had previously been performed. New or supplemental agreements were negotiated under which plaintiff was required to pay Southern approximately $24,000 annually in ex-

cess of the amount paid by M & O for the use of the same properties. For the year 1949 the total payment made to Southern by the plaintiff amounted to $261,028, including $133,187 for the Birmingham terminals.

Following the acquisition of the M & O properties, plaintiff used defendant's line from Ruslor to Haleyville, and defendant used plaintiff's line from Perry to Ruslor, and payments were made each to the other upon the terms stated in the 1906 contract. During the ten-year period 1942 to 1951, both inclusive, plaintiff paid defendant a total of $2,-091,599.55, and defendant paid plaintiff a total of $2,073,813.19.

Under paragraph 7 of the 1906 contract, IC and M & O each agreed:

"that for the right to use as provided in this agreement those parts of the railroads above described, including the facilities and appurtenances mentioned, it will pay the grantor company an annual rent which shall be equal to two (2) percent of the value of that part of the railroad of the grantor company used hereunder; and also one-half of all taxes, assessments and governmental charges payable, assessable, or property chargeable thereon * * *. The said rents and taxes shall be paid by the grantor companies respectively, in equal monthly installments at the end of each month during the term of this agreement * * *."

Paragraph 8 of the contract contains, among other provisions, the following:

"In addition to the rent mentioned in Article seven (7) of this agreement, each of the grantees shall, and hereby agrees that it will pay to the grantor company, such proportion of the monthly expenses incurred by the grantor company for the purposes mentioned in this article, as the mileage of cars and engines in the service of the grantee company on the said tracks of the grantor company, shall

bear to the total engine and car mileage thereon during the same month."

When the total payments hereinabove referred to are broken down, it will be found that for the ten-year period above referred to IC paid G M & O under paragraph 7 rent totaling $394,122.87 and taxes totaling $168,064.99. For the same period G M & O paid IC rent amounting to $1,088,753.05 and taxes amounting to $279,214.15. Under paragraph 8, IC paid G M & O expense for maintenance and operation amounting to $1,511,625.33, and G M & O paid IC for those items $723,631.85.

IC moved 1,440,260 cars, engines, and tenders over G M & O's line during the ten-year period 1942 to 1951, and G M & O moved 249,809 over IC's line.

Paragraph 20 of the contract provided that it should take effect as to rights and privileges, rents and charges when the Ruslor-Haleyville line was completed and put in operation. This line was placed in operation on April 19, 1908. Paragraph 20 further provides as follows:

" * * * said parties hereby agree that they and each of them will perform all acts necessary to renew or extend their respective charters and to continue their corporate existences in perpetuity if possible."

On March 10, 1950, the executive committee of the board of directors of G M & O authorized the termination of the trackage contracts with Southern, and directed its officers to negotiate with IC for the termination of the 1906 contract on an amicable basis. The officers were also authorized to file an application to the Interstate Commerce Commission for a certificate of public convenience and necessity permitting the abandonment of operations over the IC lines from Ruslor to Haleyville. Following an exchange of letters as to possible agreement between the two companies, and on May 30, 1950, G M & O wrote IC, enclosing a copy of its application to the Commission, and requesting IC to accept the letter with the application attached, as notification of its intent to terminate the 1906 contract when authorized to do so by the Commission. After having made certain conditional agreements with the Louisville and Nashville Railroad Company, herein referred to as L & N, G M & O, along with its application to abandon, filed an application for authority to operate under trackage rights over the lines of the former company from Tuscaloosa, Alabama to Birmingham, a distance of approximately 55 miles. IC, Southern, The Alabama Great Southern Railroad Company, and the New Orleans & Northeastern Railroad Company intervened in opposition to the applications, and L & N intervened in support thereof.

At the time of the hearing on its applications before the Commission, plaintiff was operating one train daily between Ruslor and Birmingham in each direction. Operations of that line produced total revenues of $2,771,270 in 1948, $2,780,532 in 1949, and $662,651 for the first three months of 1950. Net income for those years amounted to $616,912, $634,429 and $141,999 respectively. The operations of plaintiff between Ruslor and Birmingham during all the period 1942 to 1952 were profitable.

For the use of the Tuscaloosa-Birmingham track and facilities, plaintiff agreed to pay L & N an annual rental of $125,000, plus a user basis portion of five per cent per annum on the cost of additions and betterments made to the jointly used property, and its user basis portion of taxes, assessments and other governmental charges against said property.

The Commission granted plaintiff's application to abandon, and, subject to modification of the annual rental from $125,000 to $100,000, granted its application for authority to operate under trackage rights over the L & N lines from Tuscaloosa to Birmingham.

On April 22, 1952, plaintiff ceased operations over IC's Ruslor-Haleyville line and Southern's Haleyville-Birmingham line and commenced operations over L & N's Tuscaloosa-Birmingham line. By this change, plaintiff reduced its operation under trackage rights over other railroads serving Birmingham from 172 to 55 miles. Since operations ceased over the lines referred to, G M & O has neither operated over nor used said lines.

Plaintiff introduced testimony before the Commission to show that the transfer of its operations from the Ruslor-Birmingham line to the Tuscaloosa-Birmingham line would result in an annual net savings of $300,000 on the traffic then being handled and that it would also secure additional profits of $204,139 from traffic then being handled but upon which it expected to secure a longer haul as a result of its change of operations. The actual results of the operations since the changeover are not shown. The Commission was of the opinion, that making due allowance for claimed understatements as to compensation and costs for use of the L & N line and the asserted liability to IC under the 1906 contract, plaintiff would still have a financial advantage by use of the L & N line amounting to $80,500 annually.

The evidence. before the Commission revealed that the Ruslor-Haleyville operation would not be unprofitable without plaintiff's support; that the overall maintenance cost would continue in about the same amount; that IC expected to continue the operation of said line whether or not plaintiff was permitted to abandon its operation; that the plaintiff expected to go through with its agreement with L & N without reference to whether it had to continue rental and other payments to IC under the 1906 contract; and that said rental and other payments would amount to $148,747 annually.

The total expense of maintaining and operating the IC line from Ruslor to Haleyville for the year preceding abandonment amounted to $415,707.94. 13.84 per cent of this, or $57,520.96, was plaintiff's portion. For the first year following abandonment, such expense amounted to $464,228.61, 100 per cent of which was borne by IC.

The total expense of maintaining and operating the Haleyville-Jasper line for the year preceding abandonment by the plaintiff amounted to $464,244.24, of which IC paid 63.65 per cent, or $295,515.09, and plaintiff 9.99 per cent, or $46,367.93, and Southern the balance of $122.361.22. For the first year following abandonment, such expense totaled $456,753.32, of which IC paid 74.38 per cent, or $339,734.87, and Southern paid the balance amounting to $117,018.45. The increase to IC resulted primarily from reapportionment of the expenses between two instead of three companies.

In its application for abandonment plaintiff prayed for a determination and finding that upon cessation of operations by the plaintiff between Ruslor and Haleyville any further payments to IC under the 1906 contract would not be consistent with the public interest. It specifically prayed to be relieved of any obligations under that contract. In resisting the application, IC took the position that the Commission was without authority to relieve the plaintiff of its contractual obligations for the payment of rent. The Commission ruled that it had no power to reform contracts or to relieve carriers of their financial obligations thereunder in connection with an application to abandon.

Division 4 of the Commission concluded: [1]

1. The Commission stated that the facts of record warranted the following major findings:

"1. That the applicant will reduce its operation under trackage rights over other railroads in serving Birmingham from 172 miles to 55 miles, and thereby make ·of its system a more closely knit unit ·of transportation enabling it to increase ·the efficiency and economy of its Bir-

"that public convenience and necessity would not permit abandonment of operations by the applicant between Ruslor and Birmingham unless some other appropriate means of handling the present traffic is provided. * * *

"that the acquisition by the Gulf, Mobile and Ohio Railroad Company of (a) trackage rights over the line of the Louisville and Nashville * * * and (b) the joint use of certain terminal facilities of Louisville and Nashville * * * is a transaction * * * that * * * will be consistent with the public interest.

"When and if operations are begun * * * there no longer would be need for the continuance of service by the applicant over the lines of the Illinois Central and Southern between Ruslor and Birmingham.

Accordingly, further operations by the applicant over such lines would impose an unnecessary and undue burden upon the applicant and upon interstate commerce.

" * * * that the present and future public convenience and necessity permit abandonment by the Gulf, Mobile and Ohio Railroad Company of operations under trackage rights over the Illinois Central Railroad Company between Ruslor (Corinth), Miss., and Haleyville, Ala., and over the lines of the Southern Railway Company between Haleyville and Birmingham, Ala. * * * "

Neither plaintiff nor defendant sought a review of the findings of Division 4 by the full Commission. There has been no application under 28 U.S.C.A. §§ 1336, 2321, 2324, and 2325, to a three-judge district court.

---

mingham operation, particularly in connection with the prospective movement of iron ore from Mobile to Brimingham.

"2. That the change in operation proposed will be of advantage to the applicant even though it may be required to continue payment to the Illinois Central under its contract.

"3. That no substantial difference in service will result as to the traffic handled to and from points north of Corinth, but that a substantial improvement can be made by the applicant in its Birmingham service insofar as traffic handled to and from points south of Tuscaloosa including the major cities of Mobile, Jackson, Miss., and New Orleans.

"4. That the applicant will be able to handle Birmingham traffic to and from numerous points in Mississippi located on its own lines of railroad which heretofore it has been unable to serve in that manner because of circuity restrictions.

"5. That the applicant will be able to establish a single-line rail-truck service for less-than-carload traffic between Birmingham and points in Mississippi superior to any rail service now in effect and enable Birmingham shippers to reach a market in which they have been unable to compete because of inadequate transportation facilities.

"6. That some diversion of traffic from other carriers may result, but such diversion will have little or no adverse effect upon their ability to provide adequate transportation service in the area served, and the competing railroad carriers generally will continue to have an advantage over the applicant in route distances and schedules.

"7. That in the absence of contractual requirements the applicant is under no obligation to continue oerations over lines of other carriers in order that they may not suffer financial loss if its own service to the public can be improved by making better arrangements.

"8. That on the whole the benefit to the applicant and the public from the proposal will outweigh any injury which may be inflicted thereby on the protesting railroads.

"9. That the terms and conditions relating to the operation by the applicant over the line of the Louisville & Nashville between Tuscaloosa and Birmingham are found just and reasonable upon modification thereof to provide that the fixed interest rental shall not exceed $100,000 annually.

"As indicated above, the proposal of the applicant to acquire trackage rights between Tuscaloosa and Birmingham will promote adequate transportation service to the public. No other carrier has requested to be included in the transaction. No guaranty or assumption of the payment of dividends or fixed charges is involved, and there will be no increase in total fixed charges."

There is considerable evidence relating to the circumstances leading to and the consideration for the execution of the 1906 contract. Some of the evidence is offered by the plaintiff in an attempt to show that for several years before the execution of the contract IC was endeavoring to reach the Birmingham traffic area, and would have built either the Ruslor-Birmingham line or another of two lines for which surveys had been made, even though M & O had not contracted for joint use of the former line. On the other hand, evidence is offered by the defendant to show that the 1906 contract was the moving consideration for the construction of said line, which as the evidence shows has no direct connection with any other line owned by the defendant. There are inferences from the evidence that Southern was concerned lest IC build a line, the route of which IC had surveyed, paralleling the Tuscumbia-Jasper line of its subsidiary, Northern Alabama, and that for that reason Southern was motivated to commit its subsidiary M & O to the execution of the contract for the joint use of the Ruslor-Haleyville line and was itself willing to guarantee the latter's performance thereof.

There is considerable evidence relating to the duration of the 1906 contract. The parties appear to have always construed the contract as one running in perpetuity; the evidence establishes the fact that the contract is of perpetual duration; the evidence also establishes the fact that whatever liability M & O had under the contract, plaintiff has assumed.

It is undisputed that plaintiff has not made IC any payment of rent or taxes under the contract since the abandonment of the Ruslor-Haleyville line. IC makes no claim for use under paragraph 8 of the contract, but insists upon plaintiff's liability for rental and taxes under paragraph 7.

This case was submitted upon written evidence and stipulations. During extended oral arguments, the parties were afforded full opportunity for the development of their various contentions. The issues have been briefed with commendable thoroughness. Four main claims are advanced by plaintiff. These will be considered in the order asserted. The defendant contests the validity of each claim. It takes the position that the court needs only to consider the contract and the order of the Commission. It states that the sole issue before the court is whether the order of the Commission and plaintiff's abandonment of use pursuant to the permission granted in that order relieve plaintiff from its covenant to pay rent and one-half the taxes for the "right to use" the track in question.

I

Plaintiff's first and principal claim for relief is that its obligation to continue payments under paragraph 7 of the 1906 contract was extinguished by the Certificate of Public Convenience and Necessity authorizing abandonment of the Ruslor-Haleyville line. The answer to this claim is found in a determination of possible conflict between the Commission's order permitting abandonment and the provision of paragraph 7 of the contract. If such a conflict exists, the order prevails.

In the proceedings before the Commission, plaintiff prayed for a finding that, upon cessation of operations over the line, further payments to IC would not be consistent with the public interest. It also prayed that the Commission attach to the Certificate a condition that, upon exercise by the plaintiff of the authority to abandon, it cease making payments to IC, and be relieved of any further obligation for the payment of rent. By its order, the Commission expressly disclaimed authority to relieve plaintiff from its contractual obligation for the payment of rent.[2] In

---

2. The Commission saying:
"This Commission, over a long period of years, has uniformly held that it has no power to reform contracts or to relieve carriers of their financial obligations thereunder in connection with an applica-

so doing, it reviewed and analyzed a number of the decisions which are now urged upon the court as controlling with respect to plaintiff's first claim.

To attempt an analysis of the many cases cited in the briefs would unduly extend this opinion. Plaintiff places particular emphasis upon State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878; Meacham v. Louisville & N. R. Co., 293 Ky. 642, 169 S.W.2d 830; and Western Pac. R. Co. v. Nevada-California-Oregon Ry., D.C.N.D.Cal., 40 F.2d 731. Defendant's principal reliance is upon Central New England R. Co. v. Boston & A. R. Co., 279 U.S. 415, 49 S.Ct. 358, 73 L.Ed. 770; New York Cent. R. Co. v. Central New Eng. R. Co., 264 Mass. 128, 162 N.E. 324; and Regents of University System of Georgia v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363.

In State of Colorado v. United States, the Supreme Court held that a charter provision of an interstate carrier which was in conflict with the Commission's certificate permitting abandonment of an intrastate line, which for years had been operated at a deficit, must give way and that the State could not by virtue of such provision compel a carrier to continue operation of the line where the Commission had said the carrier need not do so.

The Meacham case involved a right of way deed under which the railroad agreed to maintain a switch and flag stop on plaintiff's land. After years of deficit the line was abandoned pursuant to an order of the Commission.[3] The railroad offered to quitclaim the right of way to the plaintiff. The offer was refused. A damage suit followed. The court held that on the facts in that case the contract was unenforceable.

In the Western Pacific case, the defendant was permitted to abandon a portion of the railway line connecting with that of the plaintiff. For a period of years the expense of operating this connecting line had exceeded its operating revenues. The suit was for damages for the breach of a contract for an exchange of freight and passenger traffic. The Commission had before it both the application for abandonment and an ancillary proceedings concerning a division of joint rates, fares and charges on interchanged traffic, which were "the very subject matter of the contract" sued on. The ancillary proceedings had been instituted by the Commission on its own motion during the pendency of the application for abandonment. The ruling was in favor of the defendant on plaintiff's demurrer to the answers and on its motion to strike therefrom certain alleged defenses. The answer among other things set up as a defense the certificate of abandonment.

In the Central New England case, the defendant, due to heavy losses in operation, was permitted to abandon a segment of its line between Agawam and Agawam Junction at which point it made connection with plaintiff's line. In 1899, defendant entered into a contract for trackage rights over plaintiff's line between Agawam Junction and Springfield, Massachusetts. This contract was to continue in effect until August 30, 1940. As rental, defendant agreed to pay the sum of $15,000 annually. The certificate was issued in 1921, and following abandonment plaintiff brought suit and secured a recovery.

tion under Section 1(18) of the Act [49 U.S.C.A. § 1(18)].

"The applicant fails to draw the distinction between conditions which affect only the applicant and give it the alternative of doing one thing or another, and conditions which would impair State laws or vested rights of the parties. The latter we may set aside only upon a clear grant of authority similar to that contained in Section 5(11) [49 U.S.C.A. § 5(11)].

"We are of the opinion that we are not authorized by order to declare that the obligations created by the contract between the applicant and the Illinois Central are set aside other than to the extent necessary to effect a compliance with our certificate * * *."

3. 236 I.C.C. 151.

The judgment of the lower court was affirmed. New York Central R. Co. v. Central New England Ry. Co., 264 Mass. 128, 162 N.E. 324. On certiorari the Supreme Court held that the certificate permitting abandonment did not, by force of the statute, automatically cancel any contractual obligation between the plaintiff and the defendant, and that assuming the Commission had power to relieve the defendant from such obligation, the certificate did not have that effect, since the plaintiff was not a party to the proceedings before the Commission, and the certificate and the report of the Commission did not purport to deal with that subject. In deciding the issues, the court said [279 U.S. 415, 49 S.Ct. 359]:

" * * * Even if the broad purposes ascribed to the act be assumed, it is not to be supposed that the Commission intended to do more than was stated in its order or to deprive respondent of income to which it was entitled under its contract for the purpose of lightening the financial burden of petitioner, both of whom were interstate carriers, without giving respondent an opportunity to be heard and without dealing with the question specifically.

"To the suggestion of petitioner that, by force of the statute, the permission to abandon its line necessarily operated to cancel its obligation, regardless of the intention of the Commission, we need only say that the statute contains no such provision nor any language suggesting it. We need not decide whether such may be the effect of a proper order of the Commission on contracts previously entered into by the carrier and not expressly mentioned in the order, where the contract and the order necessarily conflict. See [State of] Colorado v. United States, 271 U.S. 153, 165, 46 S.Ct. 452, 70 L.Ed. 878; [State of] New York v. United States, 257 U.S. 591, 601, 42 S.Ct. 239, 66 L.Ed.

385. Cf. New England Divisions Case, [Akron, C & Y R. Co. v. U. S.], 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605. But without such a conflict, there could be no justification for holding that the order would also operate sub silentio to release a carrier from a contract merely because it has ceased to be of value through compliance with the order. This is especially the case where the other party to the contract is another common carrier with whose financial condition the Commission is equally concerned."

In Regents of University System, the Court was construing a decision of the Federal Communications Commission under a statute authorizing that agency in connection with the grant of a certificate for renewal of a license for a radio station to "make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions" of the Communications Act. 47 U.S.C.A. § 303(r). The Court held that the Commission had no power to void a stock-purchase contract under which the Regents agreed to pay plaintiff Carroll each month for a term of approximately seven years a sum equal to fifteen percent of the net billings of the station. On an application by the Regents the Commission had issued a certificate for renewal subject to the condition that the contract be given no further effect. In its opinion, the Court said [338 U.S. 586, 70 S.Ct. 378]:

" * * * The Commission may impose on an applicant conditions which it must meet before it will be granted a license, but the imposition of the conditions cannot directly affect the applicant's responsibilities to a third party dealing with the applicant.

" * * * It could insist that the applicant change its situation before it granted a license, but it could not act as a bankruptcy court

to change that situation for the applicant. * * * "

Neither the Colorado nor the Meacham case involved the payment of rent after abandonment. These cases, as well as the Western Pacific case, involved abandonment of sections of the companies' own unprofitable lines. In all these cases the certificates permitted the complete discontinuance of operations on the abandoned sections—matters directly affecting the public interest as to which the power of the Commission is paramount. The Western Pacific case also dealt with a contract for a division of joint rates, fares and charges on interchanged traffic. A contract of that nature falls within the regulatory powers of the Commission.

The Colorado case antedates the Central New England case. The Meacham opinion makes no reference to the latter case. Whereas, the court in Western Pacific [40 F.2d 733] made the following significant pronouncement in citing the Central New England case:

"* * * Contracts between carriers may be of such a character as not to be affected by the action of the Commission in permitting the abandonment of a portion of a railroad connecting the lines of the contracting parties. Central N. E. Ry. Co. v. Boston & A. R. Co., supra. * * * "

■ The instant case does not involve abandonment of an unprofitable line. The Ruslor-Haleyville line has continuously represented a profitable operation to the plaintiff. Plaintiff has not discontinued freight and passenger service, but has merely shifted from a profitable to a more profitable operation. This shift has imposed additional financial burdens upon the defendant, which like the plaintiff is an interstate carrier. The contract was not a burden upon commerce before the certificate issued. On the contrary, the Commission held "that public convenience and necessity would not permit abandonment of operation * * * unless some other appropriate means of handling the present traffic is provided." It is not shown that its enforcement will affect the solvency of the plaintiff. Although the net annual income from the Ruslor-Haleyville line was averaging approximately $600,000 at the time of abandonment, plaintiff, after making due allowance for rental and taxes under paragraph 7, still has a financial advantage by the use of the L & N line amounting to $80,500 annually. The order permitting abandonment was in no respect mandatory. The certificate was permissive only as are all such certificates. Abandonment by C. R. I. & P. Ry., 131 I. C. C. 421.

The court has reviewed the contract in the Central New England case [264 Mass. 128, 162 N.E. 330]. By that contract, the Albany company agreed to "license and permit" the lessee to pass with its trains over the former's line until the thirtieth day of August, 1940, with "the right to use" in connection with such trains all present and future water stations and other facilities necessary for the accomodations of such trains. The Supreme Judicial Court of Massachusetts, in passing upon the office of the certificate in that case and its effect upon the contract, said:

"The end sought by the commission in issuing the certificate, the wiping out of the operating loss, does not involve the removal of the fixed charge for rental. In addition both parties to the agreement are interstate carriers. * * *

"* * * The agreement is free from ambiguity and indicates beyond a doubt that the annual payment was to be made irrespective of use. It was consideration paid for the right to use and not for the use * * *.

"We think the Central New England Railway Company under the terms of the agreement can be held liable for breach of contract. * * *

"* * * The certificate is not material upon the question of repudiation because it does not justify the repudiation."

 The only contractual obligations with which either Congress or the Commission has any concern are those which affect the public interest by imposing burdens on interstate commerce. The right of service to the public is not here involved. Under the facts now presented and under the authority of the Central New England and Regents of University System cases, I am of the opinion that the payment of rent and taxes in compliance with paragraph 7 of the 1906 contract will not impose a burden on interstate commerce and that such contract does not conflict with the Commission's order permitting abandonment.

## II

 By its second claim plaintiff denies any obligation to pay on the ground that there is no express general covenant to pay, and, further, that there is no specific provision that it must pay in the event it lawfully abandoned operations.

Plaintiff asserts that the annual rental and tax payments are for actual "use" and not merely for "the right to use." Defendant is firm in its view that the contract is without ambiguity and that such payments are to be made irrespective of use.

The 1906 contract is lengthy but, in short summary, plaintiff's predecessor, M & O, was granted "the right and privilege to use in common" with its grantors the line of railroad to be constructed from Ruslor, Mississippi, to Haleyville, Alabama (Sec. 4). This grant of "the right of joint use" included the use of the main track and switches, and certain other facilities appurtenant to the line of railroad of the grantors (Sec. 5). M & O accepted the grant and agreed that it would make use of the rights and privileges granted and that for the "right to use" * * * the facilities described it would

pay an annual rent equal to two (2) percent of the value of that part of the railroad "used hereunder" and also one-half of the taxes thereon. It agreed to pay said rent and taxes in equal monthly installments at the end of each month (Sec. 7) during its corporate existence, which was to be extended in perpetuity (Sec. 20).

Resort to the terminology employed reveals that by Section 4, M & O was granted "for the term herein limited, upon the terms hereinafter expressed, the right and privilege to use" the railroad to be constructed.

Section 5 limits the "right of joint use hereby granted" to certain specified facilities, which are "appurtenant to the line of railroad of the grantor company, the right of joint use of which is hereby granted."

 Under Section 7, the annual rent and taxes were to be paid "for the right to use as provided in this agreement, those parts of the railroad above described." This rent was to be based on two (2) percent of said value, and it does not appear to me that the employment of the word "used" in the descriptive phrase "of that part of the railroad of the grantor company used hereunder" qualifies the grant, particularly in view of the last sentence of the paragraph, which provides that said rent and taxes shall be paid monthly *during the term* of the contract, namely, during plaintiff's corporate duration and in perpetuity. Likewise the phrase "shall pay for the use," employed in Section 19, is part of a clause used to describe the property or facilities as to which the value formula therein set out was to be applied. Looking at the language of the contract as a whole, the phrases "to use" (Sec. 6), "the use of which * * * is granted" (Secs. 6, 8, 10), "used jointly hereunder" (Secs. 6, 7), and "jointly used hereunder" (Secs. 8, 14) were, in my opinion, also used in a descriptive sense and were not employed to qualify or to limit the specific grant of "the right to use," requiring payment only

during use or when used. The words "use" and "used" should not be singled out as having a significance beyond that to be given to them elsewhere in similar context or in parallel situations. In Vol. III, Willison on Contracts (Rev. Ed.), sec. 618, it is stated:

"In general, a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons."[4]

In G.F.A. Peanut Ass'n v. W. F. Covington Planter Co.,[5] the Alabama Court stated that it was an established rule that:

"* * * it should be said that inconsistencies in contracts are to be reconciled, if susceptible of reconciliation, and if not, the doubt will be resolved in favor of the first clause as expressing the agreement and intention of the parties within the law (Lowery v. May, 213 Ala. 66, 104 So. 5), and when considered in and collected from the entire instrument. Bryant, Adm'r v. Stephens, et al., 58 Ala. 636."

The cited case of Lowery v. May involved a conflict between the granting and habendum clauses of a timber deed. The court held that where there was a conflict between these clauses, the first and granting clause would control. This rule is recognized by a majority of the cases.[6]

There is considerable conjecture as to the influence the 1905 decision in Grand Trunk W. Ry. Co. v. Chicago & E. I. R. Co.,[7] may have had on the minds of those who drafted the 1906 contract. In that case the lease covered certain "exclusive" property, as to which the defendant did not contest its obligation. It also covered property to be used in common. The Court, in referring to the agreement as to the latter, said:

"* * * There is, in respect of the common property, no obligation to pay on the part of either tenant, except upon the basis of the use actually had. There is no express obligation to use. * * *" 141 F. at pages 798–799.

"* * * We think, therefore, that the practical construction placed upon these leases by the parties in interest supports the construction which we are constrained to give them, that, with respect to the 'common property,' there was no covenant to use, but merely a covenant to pay certain charges in the proportion that its use by the covenantor bore to the whole use." 141 F. at page 800.

Whether or not there was a studied effort to avoid the impact of the Grand Trunk case is unrevealed. From the language used, such effort may be readily inferred. M & O was not only granted "the right to use", but it agreed that it would "make use of the rights and privileges * * * granted * * * during the term" of the lease, and that it would make monthly payments of the rent and taxes during such term.

Apart from the language employed in drafting the contract there were special considerations calling for payment of rental for "the right to use." Among these considerations was the fact that IC was investing more than $4,000,000 in a new line, which, when constructed, would be detached from any other line owned by it. Payment of the expense for maintenance and repair was governed by a separate provision in Section 8, and was upon a "wheelage" or use basis.

I am of the opinion that the first aspect of plaintiff's second contention cannot be sustained.

Plaintiff takes the further position that in the absence of an express covenant to pay after a lawful abandonment

4. See, Willingham v. Life & Casualty Ins. Co., 5 Cir., 216 F.2d 226.

5. 238 Ala. 562, 566, 192 So. 502, 506.

6. 17 C.J.S., Contracts, § 309, p. 727;

Peavy-Byrnes Lumber Co. v. Long-Bell Lumber Co., D.C.W.D.La., 55 F.Supp. 654, affirmed 5 Cir., 150 F.2d 49.

7. 7 Cir., 141 F. 785.

of use, the courts will not imply such an obligation; and that since the Certificate has destroyed the obligation to use, the case is precisely the same as Grand Trunk Ry. Co. By this argument, plaintiff attributes controlling effect to that case. The crux of that opinion is found in the holding that there was no obligation to pay "except upon the basis of the use actually had." In that case, there was merely a grant of the right to use to the extent desired without any direct obligation to use.

 Having previously concluded that the 1906 contract obligated the plaintiff to make payment of rent and taxes for "the right to use," rather than for the "use actually had," the court does not concur in the view that the Grand Trunk case is controlling in the particulars asserted, even though the 1906 contract does not contain an express covenant to pay after lawful abandonment of use, since it is the rule that if one of the contracting parties desires to be excused from performance in the event of a contingency arising, it is his duty to provide therefor in the contract.[8]

 Section 16 provides for specific exceptions to the general covenant to pay rent. These are *destruction or injury* by public enemy, fire, flood, or unforeseen event. In those cases if the grantee is deprived of use for more than five days, the rent for the property will abate until the property is restored to a suitable condition for use. There is no destruction or injury here involved. An inclusion of an exception necessarily excludes all others. The general rule of law applicable is stated as follows:

"A provision in a contract that performance shall be excused in the event of certain contingencies cannot be extended to cover contingencies not specifically provided for." [9]

In Domeyer v. O'Connell,[10] the Illinois Court said that:

" * * * absence of a provision from a contract is evidence of an intention to exclude such provision. Certainly, the fact of such absence cannot, of itself, give rise to an implied intention to include it." 4 N.E.2d at page 832.

I am of the opinion that this case falls more nearly within the compass of the Central New England decisions, supra, than of the Grand Trunk case. The obligation in this case arose out of the general covenant and an express covenant to pay after abandonment is not essential.

Plaintiff's position on this issue is not well taken and is contrary to the principle stated.

### III

Plaintiff next contends that the consideration for continued payment has failed without its fault, due to the fact that it cannot now lawfully use the Ruslor-Haleyville line, since the right to use has been extinguished by the Certificate followed by abandonment of use.

The Transportation Act[11] provides that nothing therein shall in any way abridge or alter the remedies now existing at common law. Having resolved adversely to plaintiff, the issue of possible conflict between the Certificate and the contract, the rights and obligations of these parties are to be determined by common law rules.

 It is a general rule of the common law that when the consideration for a promise wholly fails, the promisor is relieved from liability.[12] Failure of consideration may result from impossibility of performance, but before one will be relieved from performance on that account, the impossibility must consist in

8. 17 C.J.S., Contracts § 104, p. 459; Phelps v. School District, 302 Ill. 193, 21 A.L.R. 737.

9. 17 C.J.S., Contracts, § 460, p. 951.

10. 364 Ill. 467, 4 N.E.2d 830, 108 A.L.R. 476.

11. 49 U.S.C.A. § 22.

12. 17 C.J.S., Contracts, §§ 128, 420, pp. 476, 905; 12 Am.Jur. 925.

the nature of the thing to be done and not merely in the incapacity or inability of the promisor to do it.[13] When a covenantor has agreed to an obligation possible to be performed, unforeseen difficulties will not excuse performance, and he must abide by his obligation unless performance is rendered impossible by an act of God, by law, or by the other party.[14] A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove.[15]

■ Plaintiff relying on Meacham v. Louisville & N. R. Co., supra, and other authorities insists that it acted under the compulsion of a duty in applying for the Certificate, and that, therefore, it cannot be said that it voluntarily abandoned the line. This contention is on the basic assumption that plaintiff in making the application was acting to remove a burden on commerce. As previously noted, the operation under the contract was not a burden on commerce. Furthermore, the Certificate permitting abandonment was permissive only, a circumstance apparently not considered in the Meacham case. Having on its own volition exercised a mere permissive right to abandon use of the line, plaintiff cannot now be heard to say that the consideration for the contract has failed due to impossibility of performance. Under the facts of this case, and on principles of simple justice, plaintiff cannot be permitted to shield itself from its contractual liability by obstacles of its own creation.

One of the considerations for the 1906 contract was the construction by IC of a new 81-mile line at a cost of more than $4,000,000. This line afforded M & O a shorter route from Corinth to Birmingham, and removed a prospective competitor for the Southern by the elimination of a projected parallel line. A further consideration for the contract was IC's perpetual obligation for the payment of rent, one-half the taxes, and a substantial part of the maintenance on lines rented from M & O and Southern, which lines were already in existence and for which they previously had no tenants. M & O and Southern are protected in the performance by IC of its covenant to pay since IC has made a capital investment of over four million dollars in a line that cannot be reached except over the M & O and Southern lines and that cannot be legally used without the payment of the rents and other charges. These considerations were all executed. The covenants are reciprocal, continuing any consideration for each other. Plaintiff's contention that there is a failure of consideration cannot be sustained under the evidence and the applicable legal principles.

## IV

■ Finally plaintiff says that there is no longer any need for the Ruslor-Birmingham operation, and that continued operation would be an undue burden on plaintiff and on interstate commerce, and that the court should apply the law to the findings of the Commission and adjudge that any obligation of plaintiff to continue to make payments is extinguished.

To sustain its position as to this claim, plaintiff relies upon the finding that "when and if operations are begun" on the L & N line, further operations on the IC line "would impose an unnecessary and undue burden upon the applicant and upon interstate commerce." Obviously, the burden referred to was that of duplicate operations. The plaintiff is not operating and does not propose to operate on both lines. The Commis-

13. Restatement, Contracts, Vol. 2, sec. 455, 12 Am.Jur. 954; Williston on Contracts, sec. 1932 (pp. 5411–14).

14. Columbus Ry., Power & Light Co. v. Columbus, 249 U.S. 399, 39 S.Ct. 349, 63 L.Ed. 669.

15. Murphy v. North Am. Co., D.C., 24 F. Supp. 471, 478; Cheatham v. Wheeling & L. E. Ry. Co., D.C.N.Y., 37 F.2d 593; Williston on Contracts, secs. 1293A, 677.

sion did not find and did not purport to find that operations on the L & N line and the continued payment of rent and taxes under the 1906 contract on the IC line were equivalent to duplicate operations. Plaintiff directs attention to Finance Docket No. 18,040, Illinois Central Railroad Company Construction, decided September 15, 1954, claiming that in that case IC took a position opposite to its position here. It cites that case as showing that the Commission has permitted carriers to institute new or different operations in order to achieve financial savings, even though other carriers may thereby suffer financial losses; and in the light of that decision plaintiff places special emphasis upon major finding 8, that on the whole the benefit to the plaintiff and to the public from the proposal to transfer operations from the IC to the L & N line "will outweigh any injury which may be inflicted thereby on the protesting railroads." It says that *any* injury which *may* be inflicted" on IC applies to each of all the possible injuries and, therefore, to all of them, including the loss of rent and taxes as well as maintenance and operating charges. This position conflicts with a reasonable interpretation of the opinion and findings when considered in their entirety. Docket No. 18,040 did not involve the breach of a rental covenant. The Commission, as already noted, emphatically disavowed authority to relieve plaintiff from its contractual obligations for the payment of rent and taxes. It stated that G M & O failed to draw the distinction between conditions "which affect only the applicant and give it the alternative of doing one thing or another, and conditions which would impair * * * vested rights of other parties." It further stated that it was not authorized to declare that obligations created by the contract were set aside "other than to the extent necessary to effect a compliance" with its Certificate. In major finding 2, it found that the proposed change would be of advantage to G M & O "even though it may be required to continue payment to Illinois Central under its contract."

A financial burden of an interstate carrier is not invariably a burden on commerce. The Commission having disclaimed authority to relieve plaintiff from its contractual burden to pay rent and taxes, the Court, under the facts here presented, declines to hold that the legal effect of the order was to extinguish plaintiff's obligation to make such payment.

Plaintiff is not entitled to the relief prayed for. A decree as prayed for by the defendant will be entered declaring that plaintiff is legally bound to the defendant under the 1906 contract for the payment of rent, and one-half of the taxes, assessments, and charges, all as more particularly detailed in section 7 thereof. Rulings upon plaintiff's written objections to the admissibility of evidence will also be entered.