Village of Midlothian, a Municipal Corporation, Plaintiff-Appellee, v. Village of Robbins, a Municipal Corporation, Defendant-Appellant.

Gen. No. 50,849.

First District, Fourth Division.

March 10, 1967.

McCoy, Ming & Black, of Chicago (Walter K. Black, of counsel), for appellant.

Elbert F. Elmore, of Midlothian, Village Attorney, and Robert J. Nolan, Special Counsel, of Chicago, for appellee.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Defendant appeals from a decree approving a Master's report and entering a declaratory judgment in favor of plaintiff. A water supply contract between

plaintiff and defendant was declared null and void because of impossibility of performance, and plaintiff was excused from further obligatións thereunder.

Plaintiff moved to dismiss this appeal, and we took the motion with the case. That motion is now denied, as we shall decide the appeal on its merits.

The contract was entered into on July 8, 1953, and provided in pertinent part:

(1) Robbins agrees to sell to Midlothian and Midlothian agrees to purchase from Robbins a supply of water subject to the provisions hereof.

(2) Midlothian agrees to use Robbins' water exclusively during the period of this contract.

. . . . . .

(9) The supply of water to be furnished Midlothian by Robbins hereunder shall not exceed an annual average of 400,000 gallons per day and not to exceed 500,000 gallons in any one day, for a period of ten years (10), after which time a new annual average and maximum day requirement shall be determined.

(10) This contract shall be in full force and continue in effect for a period of thirty (30) years from the date hereof.

For the purpose of showing the estimated population and water consumption figures on which the parties based the terms of the contract in question, plaintiff introduced into evidence, without objection by defendant, the 1953 report of an engineering firm hired by defendant, which report revised and brought up to date a 1951 report by the same firm. As found by the Master and Chancellor, also without objection or exception by defendant, the estimated population and water needs of the two villages as contained in this 1953 report formed the basis for the contract provision relating to maximum water requirements. Among other things, the

24

report projected population growth and water consumption for both villages during the thirty-year period to be covered by the water supply contract. Robbins was purchasing water from the City of Chicago for its own use and, under the contract, for resale to Midlothian. The contract provided that Robbins was to construct piping and pumping facilities sufficient to meet the needs of the two villages. Specifically, it called for construction of a 12″ line and pumping facilities considered adequate in the light of the following forecasts made by the report:

### Water Needs Per Day

|            | 1953    | 1982      |
|------------|---------|-----------|
| Robbins    | 336,000 | 1,071,000 |
| Midlothian | 227,500 | 535,500   |
| Totals     | 563,500 | 1,606,500 |

· · · · · ·

Maximum Water available through 12″ line

· · · · · ·

1,600,000 Gallons
per 24 hours

This is equal to Average 1982 day.

| Year | Population (Robbins) | Population (Midlothian) ... |
|------|---------------------|-----------------------------|
| 1953 | 5,200 | CONSTRUCTION YEAR |
| 1954 | 6,000 | 3,490 |
| · · · |        |        |
| 1962 | 11,060 | 5,410 |
| · · · |        |        |
| 1964 | 11,580 | 5,890 |
| · · · |        |        |
| 1983 | 15,920 | 7,730 |

25

It was apparent from this engineering advice that the maximum supply of water which Robbins was required to furnish Midlothian during the first ten years of the contract (" . . . an annual average of 400,000 gallons per day and not to exceed 500,000 gallons in any one day, . . .") would be well within the limits of water needs for that period, since it was based upon population figures projected for the thirtieth year of the contract. As found in the decree, however, the rapid growth of population and related water needs far exceeded engineering estimates and the expectations of both parties, and within ten years had gone beyond their contemplation at the time of the contract for the end of the thirty-year period.

The 1983 population of Midlothian was projected at 7,730, but a letter from the Bureau of the Census certified that in 1962 (according to a special census) "the population of the village of Midlothian, . . . was 8,749." Further, in the testimony of the Mayor of Midlothian, he estimated that as of 1964, the population had risen to 11,183. Water consumption had risen at an even greater rate, and in the first six months of 1964, Midlothian's daily average was 753,000 gallons, 162,000 gallons of which were acquired under emergency arrangements with the City of Blue Island. Again, this figure is far in excess of the projected Midlothian requirement of 535,500 gallons for 1982.

Returning to the date of the contract in 1953, when the 12" pipe and pumping facilities were constructed, it seemed reasonable to expect they would be sufficient for the intended purposes. As noted, the capacity of the system was estimated to be about 1,600,000 gallons per 24 hours. That this was a sound approximation of capacity is borne out by the testimony of an engineer who made a study of both the 1953 report and the supply system as it existed in July 1963. He testified that

26

his study ". . . shows that the water required for Robbins and Midlothian in May of 1963 was about 1,700,000 gallons on an average per day" and that the system's capacity "from an engineering . . . and . . . public health standpoint" would be only 1,400,000 gallons in a twenty four hour period. His opinion was that ". . . the facilities of the Village of Robbins to supply the Villages of Midlothian and Robbins are greatly inadequate." This opinion was shared by two other experts whose testimony was relied upon by the Master in his recommendations and adopted in the Chancellor's decree. It is important to note also in this regard the testimony of the Water Superintendent of Robbins. He said: "The amount of water supplied to Midlothian is the most we can supply them."

By the end of the first ten-year period of the contract there had thus been no substantial increase in the Robbins piping and pumping facilities. Nor had the parties determined a "new annual average and maximum day requirement" as called for by the contract.

On cross-examination, the Mayor of Robbins admitted that at a conference held in January, 1964, the Mayor of Midlothian had requested additional supplies of water to the extent of one million gallons per day. This January conference was not the first attempt by Midlothian to alert Robbins to its increased needs. The Mayor of Midlothian testified that after his taking office in 1962, there had been about three meetings, telephone calls, and four or five letters, all in "an attempt in the last two years to get an increased water supply from Robbins." In the early summer of 1962, Midlothian officials, with the permission of the Mayor of Robbins:

> . . . put in a new pump, a 500 gallon per minute pump. We rewired the pump house. We hooked up their chlorinators and we rebuilt their other pump

and reinstalled it. The purpose of doing all this was so we could get water. They weren't able to pump it that time, with no pumps. This work cost the Village of Midlothian around $5,000.00.

In that same year, Midlothian found it necessary to go to the Village of Markham for water on three different occasions. At other times during the existence of the contract with Robbins, Midlothian had been forced to obtain additional water from Posen and Blue Island, as well. These outside sources were on an emergency basis, however, and could not be relied on routinely. All during the time that Midlothian was pumping additional water from these other sources, the water was coming into the Midlothian reservoirs in a continuous supply from Robbins at maximum capacity rate. If the reservoirs had filled, the supply from Robbins would have been automatically shut off, but this hadn't occurred for at least two years prior to 1964. On one occasion subsequent to the January 1964 meeting, the Mayor of Midlothian had to place an emergency call to the Mayor of Robbins for water because of a fire at a time when Midlothian had only 250,000 gallons of water at its disposal.

Further support for the conclusion that the Robbins water system was inadequate to supply both villages, was specified in the Master's findings as adopted verbatim by the Chancellor:

7) The water supply to Midlothian from Robbins became erratic when the population exceeded the estimated maximum population of that village and in 1962 no water was delivered to Midlothian on five days, in 1963 it was without water on nine days and for the first nine months of 1964 there was no water delivered for six days. On 400 days out of the two years, the amount of water delivered

by Robbins to Midlothian was exceeded by the amount used by Midlothian.

• • • • • •

9) The Defendant, Village of Robbins, in order to protect its own water supply had on occasions prior to 1962 shut off the supply of water to Midlothian and Midlothian secured an injunction requiring Robbins to leave its valves open at all times. After the injunction was served upon Robbins, its officials left all valves open, which admitted water from Chicago and permitted Midlothian to acquire water from Robbins so that the amount of water delivered to Midlothian during the period subsequent to 1962 is the maximum amount available from the Robbins water supply. During the period Midlothian left all its valves open at all times and took all the water from Robbins which the Robbins system could supply it.

• • • • • •

11) These actions did not result in a sufficient supply and Midlothian purchased the additional amount needed for its inhabitants from all sources available to it, including an average purchase ranging from 125,000 gallons per day to 162,000 gallons per day in 1964 from the City of Blue Island during those months when that City had a supply in excess of its own needs and purchasing additional amounts from the Villages of Markham or Posen as supplies were available and emergencies required their purchase.

In seeking to improve Midlothian's water supply, its authorities were not merely attempting to meet their personal or political obligations to the residents of the village. Subject to a fine of $100 to $1000 and/or im-

29

prisonment up to five years, custodians of public water supplies are required by statute to maintain a continuous supply of water, safe in quality and adequate in quantity. Ill Rev Stats (1963), c 111½, §§ 121.g. and 121.n.

Concern over potential compliance with this statute was expressed as early as 1962 by both the Illinois Department of Public Health and the Cook County Department of Public Health, as well as by the Water Distribution Division of the Bureau of Water of the City of Chicago. During the period from December 1961 to June 1964, at least six separate inspections were made by State health officials of the Robbins facilities and the results sent to Village officials emphasizing and reemphasizing the progressive state of inadequacy into which the system had fallen. The public health officials repeatedly drew attention to the statute referred to above. One of these reports [1] noted that: "For quite sometime the Village of Midlothian has suffered periodical drought" and that the responsible conditions "may subject the public water supplies of Robbins and Midlothian to contamination." Particularly applicable here is the following sentence:

> The Midlothian public water supply is subject to further possible contamination due to the inability of Robbins to provide a regular satisfactory quantity of water.

Continuing with the language of the decree, the court further found:

---

[1] Letter to the Village President and Board of Trustees of Robbins, Illinois, from the Director, State of Illinois, Department of Public Health, dated May 24, 1963, reporting the results of an engineering survey made during the early months of 1963 pursuant to an agreement between officials of Robbins and Midlothian.

16) The Defendant has known at all times since 1962 of its inability to perform because of the repeated requests of the Plaintiff for additional water supply, the acts of the Plaintiff in voluntarily improving the Robbins water system and the reports of the City of Chicago and the State Department of Public Health about its water supply. The Village Of Midlothian has taken all steps reasonably required of a contracting party not only to attempt performance of its contract but also to assist the other contracting party so as to make performance by that party possible.

Defendant alleges that both the Master's report and the decree improperly interpreted the contract and are therefore erroneous as a matter of law; that the complaint and evidence in support thereof failed to show a justiciable controversy requiring a declaration of the rights of the parties; that if a breach of the contract has occurred, plaintiff has an adequate remedy at law for damages; and that the remedy of equitable rescission based on impossibility of performance was improperly invoked in this case.

We find the Master and Chancellor to have properly interpreted what we consider to be the key clause of the contract requiring Midlothian "to use Robbins' water exclusively during the period of this contract." Defendant argues unconvincingly that "exclusively" as used in this clause means "exclusively" up to the limits of "an annual average of 400,000 gallons per day and not to exceed 500,000 gallons in any one day," and that if Midlothian needed more water, they could go elsewhere to obtain it without breaching the contract. While we agree with defendant that paragraph (9), quoted above, is as much a part of the contract as paragraph (2), we cannot ignore the use of the word

"exclusive." Consolidated Coal Co. v. Peers, 150 Ill 344, 348, 37 NE 937; American Medical Ass'n v. Board of Review of Dept. of Labor, 392 Ill 614, 622, 65 NE2d 350; Black's Law Dictionary, "Exclusive." Illinois Cent. R. Co. v. Beebe, 174 Ill 13, 21, 50 NE 1019; Woods v. Great American Ins. Co., 265 Ill App 20, 23, and cases cited therein are not to the contrary. Assuming that Robbins was bound to supply and Midlothian to purchase the actual needs of Midlothian, but not in excess of the limits prescribed in paragraph (9), that arrangement has been of no effect post-1963 since those limits expressly applied only during the first ten years of the contract. The presently applicable language of paragraph (9), "after which time a new annual average and maximum day requirement shall be determined . . ." has not been complied with (through no fault of Midlothian). But that fact does not release Midlothian from the "exclusive" provision in paragraph (2) and its obligation thereunder to buy all of its water from Robbins. Although the parties would be free to negotiate a new contract on terms now contended for by Robbins, and under which Midlothian would draw only part of its supply from the present system, that problem is not within the province of this court (Pioneer Life Ins. Co. v. Alliance Life Ins. Co., 374 Ill 576, 590, 30 NE2d 66) and cannot be permitted to affect our decision. We conclude that the contract was properly voided because of impossibility of performance. Williston on Contracts (rev ed), pp 5410–5411; Restatement, Contracts, § 288; Fisher v. United States Fidelity & Guaranty Co., 313 Ill App 66, 39 NE2d 67. That impossibility is accentuated by the parties' statutory duty to furnish an adequate water supply to their respective villages. (Ill Rev Stats (1963), c 111½, § 121.g.; 17 Am Jur2d, "Contracts," § 210; Ideal Bldg. Material Co. v. Benson Concrete Co., 273 Ill App 519, 525; City of Vernon v. City of Los Angeles, 45 Cal2d 710, 290 P2d 841.)

■ We do not agree with defendant's second contention that the complaint and proofs in support thereof fail to show a justiciable controversy. Although the factual situation in A. S. & W. Club v. Drobnick, 26 Ill2d 521, 524, 187 NE2d 247, is distinguishable from this record, we find the reasoning of the court in Drobnick to be applicable here:

> It is clear from these allegations that the parties have taken an adverse position with respect to the meaning of the deed and plaintiff's duties thereunder. The dispute does not relate to a hypothetical case but is clearly an actual controversy calling for adjudication of present rights.

There is certainly a controversy between the parties to this cause as to whether for another sixteen years the Village of Midlothian is to remain tied exclusively to the insufficient water supply currently being furnished by the Village of Robbins, or whether it may seek an adequate supply elsewhere. We fail to see how, in this situation, Midlothian could be given appropriate relief by recourse to damages at law, particularly when we bear in mind the statutory penalties for failure to meet its obligations to its citizens.

Defendant's last contention that plaintiff has improvidently utilized equitable rescission is likewise unavailing. The situation presented by this action is not one of "subjective impossibility" as argued by defendant from Gulf, M. & O. R. Co. v. Illinois Cent. R. Co., 128 F Supp 311, affd 225 F2d 816 (5th Cir, 1955), cert den 350 US 932–933; 84 ALR2d 12, 29–30; and Restatement, Contracts, § 455. The case before us presents, rather, an objective impossibility. The water system as constructed and maintained without substantial expansion, represented the contemplation of the parties as they viewed the future at the time of the contract. As must have happened many times in our burgeoning suburbs, it was

built upon estimates and projections made in 1953 which have subsequently been shown to be seriously deficient. The evidence clearly establishes that the contract cannot be performed, and the remedy granted was proper.

Nor does this conclusion run counter to general principles of equity. In buying water from Chicago and reselling it to Midlothian, Robbins is not exercising its own governmental function, but is simply engaged in a venture for the making of money. As in the case of any responsible businessman, it is therefore not unreasonable that it be required to produce in quality and quantity sufficient to satisfy the contract needs of its customer. This it has failed to do, despite more than ample warnings of its progressive inability to meet even its current obligations.

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER and McCORMICK, JJ., concur.