**GULF, MOBILE and OHIO RAILROAD COMPANY, Appellant,**

v.

**ILLINOIS CENTRAL RAILROAD COMPANY, Appellee.**

No. 15452.

United States Court of Appeals Fifth Circuit.

Aug. 18, 1955.

Rehearing Denied Oct. 3, 1955.

Carl Fox, Y. D. Lott, Gen. Sol., G. M. & O. R. Co., Mobile, Ala., B. A. Monaghan, Douglas Arant, Birmingham, Ala., E. L. All, Birmingham, Ala., D. S. Wright, Mobile, Ala., James C. Blair, White, Bradley, Arant, All & Rose, Birmingham, Ala., of counsel, for appellant.

D. K. McKamy, Birmingham, Ala., John W. Freels, Gen. Sol., Ill. Cent. R. Co., Harold E. Spencer, Joseph H. Wright, Chicago, Ill., Gen. Atty., James R. Forman, Jr., Birmingham, Ala., C. A. Helsell, Chicago, Ill., Burr, McKamy, Moore & Tate, Birmingham, Ala., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal is from a judgment of the District Court for the Northern District of Alabama denying appellant, Gulf, Mobile & Ohio Railroad Company, a decree terminating its contractual obligation to pay annual rental during the corporate life of GM&O and of the Illinois Central Railroad Company to the latter company for trackage rights because GM&O had obtained from the Interstate Commerce Commission permission to abandon the use of the route over the tracks in question.

The contract in issue was signed by the parties or their predecessors or subsidiaries in 1906.[1] It provided that the Illinois Central subsidiaries would construct a certain line of railroad approximately 80 miles in length connecting Ruslor, Mississippi, and Haleyville, Alabama,[2] which would permit I.C. to have a line into Birmingham by obtaining from appellant's predecessor the right to use their tracks jointly for approximately 50 miles; the contract further provided

---

1. The parties are both guarantors of the contracts. The names of the parties and of their privies will be used interchangeably in this opinion. Abbreviations will also be used where appropriate.

2. Much of appellant's argument goes to the proposition that the agreement of the Illinois Central subsidiaries that they would construct this Ruslor-Haleyville line was no part of the consideration for the undertakings of appellant to pay the annual rent, appellant claiming that the contract remained wholly executory.

The argument was advanced that Illinois-Central desired to build the line in question in order to reach the City of Birmingham, and that it would have done so whether or not appellant had obligated itself to the payment of rent for the life of the contract. Nevertheless the contract did expressly provide that "[Illinois-Central subsidiaries] hereby agree to construct a railroad connection etc." as one of the undertakings in the contract. It appears that the cost of construction approximated $4,000,000.00.

that each of the parties as grantor granted to the other as grantee these correlative rights to use the specified trackage jointly and each of the parties as grantee agreed in paragraph 7 of the contract as follows:

"7. The Central Company and the Mobile Company respectively, accepts the grants made to it by the other parties hereto in the preceding articles of this agreement, and covenants and agrees that it will make use of the rights and privileges therein granted upon the terms and conditions in this agreement expressed, during the term hereinafter limited, and that for the right to use as provided in this agreement, those parts of the railroads above described, including the facilities and appurtenances mentioned, it will pay the grantor company an annual rent which shall be equal to two (2) per cent, of the value of that part of the railroad of the grantor company used hereunder; and also one-half of all taxes, assessments and governmental charges payable, assessable, or property chargeable thereon, whether under general or special assessment, and if under general assessment, then one-half of the part fairly apportionable to the tracks and appurtenances in question. The values of those parts of the railroads used jointly hereunder, shall be fixed by agreement between the parties hereto, and if they shall be unable to agree, by arbitration in the manner hereinafter provided. The said rents and taxes shall be paid to the grantor companies respectively, in equal monthly installments at the end of each month during the term of this agreement, at their respective chief offices, in gold coin of the United States of the present standard of weight and fineness."

Paragraph 8 of the contract also provided for payment by each grantee to the grantor company of "such proportion of the monthly expenses incurred by the grantor company for the purposes mentioned in this Article (general maintenance and operating costs and certain insurance charges) as the mileage of cars and engines in the service of the grantee company on the said tracks of the grantor company, shall bear to the total engine and car mileage thereon during the same month."

The two railroad companies used the two lines jointly from the date of completion of the Ruslor-Haleyville line by Illinois-Central continually and profitably until April 22, 1952. Illinois Central still continues to use the GM&O tracks for the use of which it paid annually to GM&O rent and taxes for the ten years, 1942 through 1951, a sum which averaged $56,218.79 per year under the provisions of Paragraph 7. During the same period appellant paid to Illinois Central an average payment of $136,796.72. In 1949 it amounted to $149,000.

Appellant abandoned the use of the Ruslor-Haleyville line on April 22, 1952. Appellant has not since made any payment of rent or taxes under the contract. This abandonment coincided with the commencement of the use of a new line which permitted it to enter Birmingham by cutting down substantially the use of tracks other than its own. This was made possible by a contract which GM&O entered into with the Louisville & Nashville Railroad Company, and by appropriate certificates of convenience and necessity issued by the Interstate Commerce Commission.[3]

The application for authority to abandon the Ruslor-Haleyville trackage of I.C. in favor of a route running from Ruslor to Tuscaloosa and Birmingham involving use of the L&N tracks just referred to, was filed by GM&O in March 1950. This application sought a certificate of public

3.        "Finance Docket No. 16989
    "Gulf, Mobile & Ohio Railroad Company Abandonment

"Finance Docket No. 16990
"Gulf, Mobile & Ohio Railroad Company Trackage Rights."

convenience and necessity permitting the abandonment of operations over the I.C. lines and sought a certificate of public convenience and necessity permitting appellant to operate under trackage rights over the lines of L&N from Tuscaloosa to Birmingham. For the use of this track and facilities, appellant agreed to pay L&N an annual rental of $125,000.00, plus the usual user basis portion of 5% per annum on the cost of additions and betterments made to the jointly used property, and of the taxes, assessments and other governmental charges against the property. The application also sought a finding and determination "that upon the ceasing of operations by Applicant over the tracks of Illinois Central Railroad Company between Ruslor, Mississippi and Haleyville, Alabama, under the said contract of January 16, 1906, as supplemented, any further payments by Applicant to Illinois Central Railroad Company under said contract would not be consistent with the public interest."

The Illinois Central intervened in the proceedings before the Commission and resisted the application as a whole, and, of course, particularly that part of the application that the Commission relieve the appellant of its contractual obligations for the payment of rent.

The Commission issued a certificate of public convenience and necessity granting plaintiff's application to abandon, and, subject to modification of the annual rental from $125,000 to $100,000, granted its application for authority to operate under trackage rights over the L&N lines from Tuscaloosa to Birmingham. The Commission ruled that it had no power to reform contracts or to relieve carriers of their financial obligations thereunder in connection with an application to abandon.

It, therefore, declined to pass upon the question as to the meaning of paragraph 7 or as to its continued vitality following abandonment.[4]

The refusal of the Commission to include a finding and determination that no further rental payments should be made to Illinois Central following the effective date of the abandonment order, left the parties at odds as to their rights and ob-

4. The Commission devoted 9 pages of its 50-page report to a discussion of the power of the Commission over contracts. In the course of this discussion the report said:

"Regardless of what may be the scope of our power to reform under section 5 (9) trackage agreements which have been approved by us under section 5(2) and the parties thus placed on notice of our continuing power in the premises, we are of the opinion that we are not authorized by order to declare that the obligations created by the contract between the applicant and the Illinois Central are set aside other than to the extent necessary to effect a compliance with our certificates. Neither what the Supreme Court has held, what Congress has written, nor what the latter has implied by the purpose underlying what it has written, persuade us that a power which we have so vigorously disclaimed we must now exercise."

It is significant in considering the contention of the appellant that a continuance of the payments to Illinois Central would somehow be an undue burden on GM & O and on interstate commerce, that the Commission found that, assuming the continued payments of the sum of $149,000, which was the rental figure for the year 1949, and assuming the correctness of other adjustments of $70,500 contended for by intervenors, "there would still be a financial advantage to the applicant by use of the proposed line for handling its present traffic amounting to $80,500 annually." The Commission thus found that even though required to continue payments under the 1906 contract, GM&O would be better off financially under the new proposal. The Commission made no findings as to whether the making of the payments in the future would constitute an undue burden on interstate commerce or that such payents "would not be consistent with the public interest." In its general findings the Commission dealt with contentions and requested findings not specifically discussed in the following language: "Contentions of the parties or requested findings as to fact or law not specifically discussed herein, have been given consideration and are found to be without material significance or not justified."

ligations for the payment of rent and taxes under Paragraph 7 of the 1906 contract. Illinois Central made no claim for the payments provided for in paragraph 8, since these were based upon a car mileage computation, but Illinois Central insisted that the obligation to make the annual rental and tax payments under Paragraph 7 was unaffected by the abandonment or by the certificate authorizing abandonment.

In this state of affairs, GM&O filed its suit for declaratory judgment. Its contentions, as set out in the brief filed in this court, are as follows:

"First: The Court should apply the law to the findings, including the basic finding by the Commission that there is no longer any need for the Ruslor-Birmingham operation and that continued operation would be an undue burden on GM&O and on interstate commerce, and should adjudge that any obligation of GM&O to continue to make payments is extinguished.

"Second: The terms of the contract do not include any promise by GM&O to pay rent (as distinguished from damages for breach of its promise to use) after a total cessation of use. GM&O, having made no such promise, cannot be held liable for payment of rent accruing after its lawful abandonment of use. All concede that GM&O has not breached its promise to use, since it acted under the authority of the Commission's Certificate, and hence that GM&O is not liable in damages for a breach of that promise.

"Third: GM&O promised to pay rent in consideration of the right to use I.C.'s railroad. That right has been destroyed without GM&O's fault, and I.C. cannot lawfully permit GM&O to use its railroad. Hence there has been a failure of consideration which excuses GM &O's failure to pay rent after abandonment of use."

The trial court, in a full and well reasoned opinion, concluded that neither the abandonment of the line nor the certificate authorizing its abandonment terminated the obligation of appellant to pay the annual rent and taxes specified in Paragraph 7 of the contract.[5]

We shall consider the above three contentions in the same order in which they are urged by appellant.

### I.

Appellant's contention that continued operation of the Ruslor-Birmingham line would be an undue burden on GM&O and on interstate commerce, and hence any obligation of GM&O to continue to make payments is extinguished.

Although stated as a contention complete in itself, this proposition is a nonsequitur, as is immediately apparent, since it does not state that the Commission found that the payments by GM&O in the absence of use would be an undue burden on it or on interstate commerce. To make this contention meaningful, it would have to be stated as follows:

The Commission found that continued operation of the Ruslor-Birmingham line would be an undue burden, and therefore not in the public interest; that payment by GM&O for the privilege of using the line in the absence of its actual use, would likewise constitute an undue burden on GM&O and not be in the public interest; that, therefore, the decision by the Commission authorizing the termination of the use of the line necessarily resulted in a termination of the obligation to make payments.

There are several criticisms of this reasoning. The first and foremost is that the Commission, although urged by appellant to do so, declined to make a finding that payment without use would be an undue burden on GM&O and on interstate commerce. The fact of the matter is that the Commission found in effect that payment without use would not be an undue burden on GM&O, since it stated specifically that the proposed new

5. Gulf, Mobile & Ohio R. Co. v. Illinois Central R. Co., D.C., 128 F.Supp. 311.

route would be profitable to GM&O even if it was required to continue making payments to Illinois Central on the abandoned line.

A further criticism of this restated proposition is that it seems to be predicated upon the assumption that the payment by GM&O for unused privileges would *ipso facto* amount to an undue burden on interstate commerce; whereas the truth is, since both parties to the contract are Class I carriers, and the loss suffered by one represents a gain enjoyed by the other, no such assumption is permissible. Certainly this court cannot say that the net benefit to the shipping public would be greater if the Illinois Central took the loss of $149,000 in annual rental than if GM&O continued to pay it. As stated above, the Commission declined to make such finding. Convinced that the Commission properly declined to do so, we are unimpressed with the contention that we should do so.

Appellant's brief, apparently seeking to bridge a gap in its effort to demonstrate that the continued payments are in conflict with, and are therefore nullified by, the Commission's certificate authorizing the abandonment of the old line, seeks mightily to give the impression that the Commission's finding of undue burden in the event of continued operation, also amounted to a finding that the payment of rent without use constituted such a burden. Without proceeding through any logical process of reasoning to persuade us that this is true, appellant simply treats the certificate as standing for this proposition.

We agree with the statement of the trial court to the effect that "the only contractual obligations with which either Congress or the Commission has any concern are those which affect the public interest by imposing burdens on interstate commerce", and further that "the right of service to the public is not here involved." [6]

These statements by the trial court are criticized by appellant as being "a denial of the Commission's major findings," citing particularly Findings 1, 3 and 5. These findings respectively found that the *proposed abandonment and substitution of the new line* would promote efficiency and economy, improvement in service and increased adequacy of facilities in reaching new markets. Not one of them had to do with the effect of the *payment of the stipulated* rent after abandonment. There is thus no inconsistency between the trial court's statements and the "major findings" of the Commission. The trial court's position in this respect is fully supported by Central New England Ry. Co. v. Boston & Albany R. Co., 279 U.S. 415, 49 S.Ct. 358, 73 L.Ed. 770, and Regents of University System of Georgia v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363.

In the Central New England Railroad case the parties had entered into a contract under the terms of which Central New England acquired trackage rights over 4.05 miles of the Boston & Albany lines, and which it could use only if it ran its trains over a connecting link of 1.87 miles of its own railroad between Feeding Hills and Agawam. It agreed to pay $15,000 per year until 1940 for these trackage rights. In 1921 it applied for and got a certificate from the Interstate Commerce Commission authorizing it to abandon operations over the 1.87 miles. This, of course, made impossible its use of the B&A trackage. It sought in the state court to obtain relief from the annual payment under the contract. The contention of Central New England there, as of GM&O here, was that the effect of the certificate was to relieve it of making payments for a use which it couldn't enjoy. The Supreme Court rejected the contention basing its opinion on the proposition that, without passing on the *power* of the Commission to abrogate existing contracts with respect to an abandoned line, an order authorizing an abandonment would not have the ef-

**6.** Gulf, Mobile & Ohio R. Co. v. Illinios Central R. Co., D.C., 128 F.Supp. 311, 321.

fect of abrogating such a contract if the order did not purport to do so.[7] The Court expressly rejected the contention that the policy of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., achieved this result, even though no such action was taken by the Commission.[8] There is no conflict between the order of the Commission authorizing abandonment here and the continuation of payments under the contract any more than there was in the Central New England case. Where there is none, the Supreme Court says the order will not be a basis for relieving a party to the contract of its contractual obligations.

Although the Regents case, supra, is not a railroad case, the reasoning of the Supreme Court in that case is quite apposite and is persuasive of the proposition that the licensing and regulatory powers granted to administrative bodies by Congress do not authorize the abrogation of or have the effect of abrogating, private contracts merely because such contract may, to a considerable degree, affect the results sought to be accomplished by the act of regulation or licensing.

■ We find that there is nothing in the Commission's findings or in its actions or in the voluntary abandonment by appellant that in any way affects whatever obligations to pay rent were contained in Paragraph 7 of the 1906 contract.

7. The order of the Commission here expressly pretermitted a decision as to the effect of its certificate upon the contract in question.

8. The Court said in this connection: "To the suggestion of petitioner that, by force of the statute, the permission to abandon its line necessarily operated to cancel its obligation, regardless of the intention of the Commission, we need only say that the statute contains no such provision nor any language suggesting it. We need not decide whether such may be the effect of a proper order of the Commission on contracts previously entered into by the carrier and not expressly mentioned in the order, where the contract and the order necessarily conflict. See State of Colorado v. United

## II.

Appellant's contention that the contract required payment of rent only so long as GM&O used the trackage and that therefore its abandonment of use under authorization by the Interstate Commerce Commission terminated any obligation to make payments as rent, and also excused GM&O from liability for damages for a breach of its agreement to continue to use the facilities.

This contention is plainly double-pronged. The first is that under the expressed language of the contract, rent was payable only so long as appellant used the trackage; the second is that if there was an expressed covenant by GM&O to *continue to use* the line during the life of the contract, its failure to carry out this agreement was excused by the issuance of the certificate by the Commission authorizing abandonment of the line.

The full text of Paragraph 7 is set out above. The significant language as respects the first part of this contention is as follows:

"* * * the Mobile Company * * * covenants and agrees that *it will make use of the rights and privileges therein granted* upon the terms and conditions of this agreement expressed *during the terms hereinafter limited,* and that for the *right to use* as provided in this agreement, *those parts of the*

States, 271 U.S. 153, 165, 46 S.Ct. 452, 70 L.Ed. 878; State of New York v. United States, 257 U.S. 591, 601, 42 S.Ct. 239, 66 L.Ed. 385. Cf. Akron, C. & Y. R. Co. v. U. S. (New England Divisions Case), 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605. But without such a conflict, there could be no justification for holding that the order would also operate sub silentio to release a carrier from a contract merely because it had ceased to be of value through compliance with the order. This is especially the case where the other party to the contract is another common carrier with whose financial condition the Commission is equally concerned." [279 U.S. 415, 49 S.Ct. 359.]

*railroads above described,* including the facilities and appurtenances mentioned, it *will pay* the grantor company *an annual rent which shall be equal to two (2) per cent, of the value of that part of the railroad of the grantor company used hereunder;* and also one-half of all taxes. * * * *The said rents and taxes shall be paid to the grantor companies respectively, in equal monthly installments at the end of each month during the term of this agreement, * * *.*"

Appellant contends that, although it bound itself to use the tracks for the full term of the contract, *i. e.,* for the life of the two corporations extended as long as the law allowed, and agreed to pay rent [9] annually in equal monthly installments during the term of the agreement, nevertheless if it violated its agreement to use the tracks the duty to pay rent as such would terminate because the amount of the rent was to be determined by the actual use, and that the claim thereafter against it would be for damages for breach of the covenant to use.

There are several fallacies in this reasoning. The first is in the significance which appellant seeks to place on the words "used hereunder," which appellant says limit the obligation to pay rent to those years in which the Mobile Company actually used the line. No such special significance can be attached to the word "used" in Paragraph 7 to indicate that the rent was to be computed only on that portion of the railroad actually *used* in any one year rather than on that portion of the railroad, which, under the contract, GM&O *bound itself to use.* It must be realized that when the parties signed the contract the obligation to pay was fixed and determined by the solemn agreement of GM&O to use and pay for the life of the contract, and therefore it was entirely unimportant whether the property, the value of which was to be used as a basis for com-

puting the rent, was described as "that part of the railroad of Illinois Central permitted to be used" or as "that part of the railroad of the Illinois Central used hereunder." This is so because obviously the parties did not have in mind any distinction between the words "used" and such words as "permitted to be used," because by the solemn obligation of the parties they meant one and the same thing.

We agree with the trial court that the words "used hereunder" were merely descriptive of the property, which, under the granting clause, appellant was privileged to, and agreed to, use for the life of the contract. It could not be considered as having the effect of nullifying the agreement of appellant to use and pay rent without right of termination. We think it would be entirely inconsistent with the clearly expressed intent of the parties to hold that the words "used hereunder" were intended to provide for the contingency that one or the other of the parties might fail to carry out its agreement to use entered into in the very same paragraph of the contract.

■ Having held, as we do, that there is no merit in appellant's first proposition under this phase of the case, that is that the contract required payment of rent only so long as it used the tracks, it is not necessary for us to consider the second proposition, that is that no damages for breach of contract to use would accrue because the breach was excused by the overriding effect of the certificate of abandonment. Nevertheless, we say that this argument fails to impress us, because even though a mandatory directive from a governmental agency acting within the scope of its powers and not initiated by the party to be benefitted might in some circumstances excuse what would otherwise be a breach of contract, such is far from the situation here. Notwithstanding appellant's effort to depict itself as being legally required constantly to seek out new plans and arrangements that might better

9. We use the terms rent as relating to rent and taxes, since the obligations are treated by both parties as being the same.

serve the shipping and travelling public, we know of no rule of law that makes such duty paramount or superior to the duty to carry out its solemnly made contracts. GM&O certainly owed no such duty to the public as would require it to seek relief from a burdensome payment for the benefit of its stockholders at the expense of the stockholders of the payee, when no segment of the public and no official of the regulatory agency was complaining or recommending relief from a transportation arrangement that was proving profitable to all concerned. Appellant's attempt to clothe its own efforts to achieve a substantial financial saving for itself with the mantle of public duty of the kind that overrides the obligation of a contract, is not persuasive. We find nothing in the Interstate Commerce Act or any of the decided cases that supports any such theory.[10]

### III.

Appellant's contention that GM&O promised to pay rent in consideration of the right to use I.C.'s railroad; that that right has been destroyed without GM&O's fault; hence there has been a failure of consideration which excuses GM&O's failure to pay rent after abandonment of use.

■ What we have already said answers to a considerable degree the several assertions here made. In the first place, the promise to pay rent was based only partly on the consideration of the right to use I.C.'s railroad. It was also based on the consideration of I.C.'s promise to construct the road, which it did at a cost of some four million dollars; and it was also based partially up-

on the corresponding promise of I.C. to use and pay for the use of some 50 miles of GM&O's tracks. All of these and other items were found by the trial court to be part of the consideration for GM&O's original promise. This finding by the court is amply supported by the record below. Thus, the consideration has not failed.[11]

Having held that there were other considerations to support the promise to continue payments for the life of the corporation, it is not necessary to discuss the contention that non-user by GM&O, however, occasioned, would have amounted to a failure of consideration if none other than the right to use were here present. However, as we have pointed out above, the non-user came about by action of appellant in seeking to improve its earnings by abandoning the route in question. This necessarily cast on I.C. a substantially higher cost for the operation of its trains over the 80 miles involved. Appellant says that the further burden of losing the annual rental payments must also be thrown on I.C. because it is the duty of GM&O to operate as economically and efficiently as possible in order to contribute to a reduction in rates.

■ This contention is obviously intended to answer appellee's argument that even if the certificate made future use impossible and thus worked a total lack of consideration, this would be no defense because of the principle that "where a party to a contract is the cause of the failure of performance of an obligation due him, he cannot take advantage of the failure."[12] Appellant, in effect, says that even if the failure of

10. The case of State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L. Ed. 878, argued extensively by appellant, does not support its contention; nor do the lower court and state decisions.

11. We think there is no merit in appellant's contention that the sole consideration "for the right to use" was the rents and tax payments. All of the mutual obligations of the parties are to be considered in any determination whether the consideration remains purely executory during the life of the contract. Surely

the agreement to pay rent "for the right to use" was at least partially supported by the heavy obligation of the grantor to construct the line which it specifically agreed to do, and to make it available for the exercise of the granted right. We cannot separate the contract into (1) a voluntary promise of I.C. to build and (2) a grant of the "right to use" in consideration of the payment of rent on the tracks when actually used.

12. Selman v. Bryant, 261 Ala. 53, 72 So. 2d 704, 708.

performance was brought about by its act, it was forced into this action by its duty to the public. This line of argument seems to us to be specious. Viewed as a whole, it appears that the Interstate Commerce Commission granted the application for the new route and the application for abandonment of the old on the simple theory that even though all intercompany payments for trackage remained untouched, there would still be a net annual saving to the entire group of railroads here involved of $80,500. Such a saving was accompanied by certain additional advantages to the applicant and worked no serious disadvantage to the intervening roads. Therefore, it can be said that the public interest was served to the extent of additional earnings by the entire group of $80,500 per year. This is the figure that should be considered in determining the ultimate benefit to the public, because it is the figure that is to be taken into consideration in rate-making. It is quite apparent from the Commission's findings that the Commission might have taken quite a different view of the applications and that it might well have disapproved them if there had not been a net overall saving in the rearrangement *without disturbing the intercompany contracts.* It seems too clear for argument that I.C.'s ability to serve its shippers would be impaired to the extent its revenues are reduced; such impairment would be no more than compensated for, so far as the public interest is concerned, by a similar enhancement of appellant's ability to serve its shippers by the savings it would enjoy if the rental payments were cancelled. Thus, we agree with appellee that while there is a definite public interest in the shifting of the route designed to afford better service, there is no public interest in the question who is to stand the economic loss of the rental payments.[13]

We think this analysis properly applies the law as contemplated by Congress in the enactment of the Interstate Commerce Act of 1940.

### IV. Measure of damages.

Appellant urges the further proposition that if we should find against its contention on the construction of the contract and its continued vitality, we should nevertheless hold that it is not under any obligation to continue to make rental payments as such, but it should be adjudged that there is a simple breach of the agreement to pay rent, and the trial court should have more clearly specified the measure of damages.

In its complaint for declaratory judgment, appellant prayed:

"(a) That the Court declare what the rights and other legal relations of the Plaintiff will be under the said contract dated January 16, 1906, after Plaintiff abandons operations over the Defendant's said line of railroad, as aforesaid.

"(b) That the Court adjudge that upon the abandonment by Plaintiff of operations over the Defendant's line of railroad between Ruslor, Mississippi, and Haleyville, Alabama, pursuant to the aforesaid Order and Certificate of the Interstate Commerce Commission, the Plaintiff will stand relieved of liability to make any payment to the Defendant under sections 7, 8, 20 and 22 of the said contract dated January 16, 1906, except in respect of amounts due thereunder for Plaintiff's use of said line of railroad prior to such effective date of abandonment."

In its answer appellee prayed:

"(a) That this Court will declare that the plaintiff is legally bound to the defendant in accordance with the terms of said contract dated January 16, 1906.

"(b) That this Court is without authority to modify, amend or alter

---

13. "This is especially the case where the other party to the contract is another common carrier with whose financial condition the Commission is equally concerned." Central New England Ry. Co. v. Boston & Albany R. Co., 279 U.S. 415, 418, 49 S.Ct. 358, 359, 73 L.Ed. 770.

the order of the Interstate Commerce Commission heretofore made."

The pleadings were thus directed to the single question as to whether there remained a continuing liability for the payment of the items of rent and taxes as described in Paragraph 7,[14] after the effective date of the certificate of abandonment. Neither party on the trial below sought to present a case on which the trial court might make findings as to any payments that were then due under the contract. The trial court's judgment adhered strictly to the pleadings and to the proof in this regard. His judgment was:

"That plaintiff is legally bound to the defendant under the contract of January 16, 1906, a copy of which was attached to the complaint in this proceeding as Exhibit 1, for the payment of rent and one-half the taxes, assessments and other charges, as provided in section 7 of said contract; * * *."

In arriving at this judgment the court necessarily found that the "property" the value of which was the basis of the annual rental was that part of the Illinois Central Railroad that was the subject of the grant to GM&O. The identity of that property was sufficiently clear for the GM&O to use it without question for some 46 years, and it is not anticipated that there will be any difficulty in determining what it is or what its value is or what may be the "taxes, assessments and governmental charges thereon." The trial court did not anticipate any need further to interpret these provisions of the 1906 contract; nor do we. The time for that will be when and if such a question actually arises upon presentation by I.C. of its annual bill for the payments which the trial court held, and which we find correctly held, are still the obligation of the grantee road. It would be unfruitful as well as inappropriate for us to attempt to prescribe the nature of the remedy of I.C. for the collection of the sums due under the contract, or to attempt to decide whether the future amounts are to be collected annually as they become due or in a single action for breach of contract. Neither should we pass on the question as to what matters of defense are available in any such action other than that dealt with in this opinion. These matters have not been presented to the trial court for its consideration and they, as well as any question as to the measure of damages, should first be passed upon by it on issues actually joined rather than by us in a vacuum.

In affirming the judgment of the trial court we do so without prejudice to either party to bring in question any issue except that which is expressly decided here, and which we understand the trial court to have decided below; that is that such obligation to pay rent and taxes as existed under paragraph 7 of the contract still exists unaffected by either the abandonment of the line by GM&O or any overriding public policy resulting from the action of the Interstate Commerce Commission.

The judgment is
Affirmed.

RIVES, Circuit Judge (dissenting).

I respectfully dissent. It seems to me that the paramount public duty rests upon the carrier to render the safest, most adequate, economical and efficient service that lies reasonably within its power.[1]

14. The parties by common consent seem to have abandoned any contentions as to provisions in Paragraphs 8, 20 and 22. The Court did not deal with them, and neither party presses them here.

1. That is, I think, implicit in the "National Transportation Policy" which precedes Section 1 of the Transportation Act of 1940, and is copied in the note at the beginning of Title 49, Chapter 1, U.S.C.A. pocket supplement:

"'It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, *adequate, economical, and efficient service* and foster

It does not seem to me to be a "sound economic condition in transportation and among the several carriers" (see footnote 1, supra) that one carrier should be held bound by a contract to pay perpetually to another rents and taxes on a line of railroad, which by order of the Interstate Commerce Commission the renting carrier has been permitted to abandon and has abandoned.

Paragraph 18 of Section 1 of the Interstate Commerce Act, 49 U.S.C.A. § 1 (18),[2] authorizes the Commission to issue a certificate that the present or future public convenience and necessity permit the abandonment of all or any portion of a line of railroad, or the operation thereof. After a full and fair hearing to which both the lessor and lessee carriers were parties, the Commission issued its certificate that,

"the present and future public convenience and necessity permit abandonment by the Gulf, Mobile and Ohio Railroad Company of operation under trackage rights over the line of the Illinois Central Railroad Company between Ruslor (Corinth), Miss., and Haleyville, Ala., * *. Provided, however, and this certificate is issued upon the express condition that the operation under

trackage rights herein permitted to be abandoned may not be abandoned until operation is commenced under trackage rights over the line of the Louisville & Nashville Railroad Company described herein."

Thereafter the Gulf, Mobile and Ohio commenced operation under trackage rights over the line of the Louisville & Nashville and abandoned operation under trackage rights of the line of Illinois Central.

The Commission disclaimed any jurisdiction to determine whether or not the rental contract between G. M. & O. and I. C. continued in force and effect, and left that task to the courts. Hence this suit.

Under Paragraph 18 of Section 1 of the Act (footnote 2, supra), the Commission had full jurisdiction to permit the abandonment of the line of railroad, "or the operation thereof," in whole or in part, and to attach to its order such lawful condition as it saw fit. My brothers say that " * * * the Commission found in effect that payment without use would not be an undue burden on G. M. & O." I do not think that the Commission's opinion is reasonably subject to any such construction, but if we differ as to the construction of its opinion, we

sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.'" (Emphasis supplied.)

2. "(18) Extension or abandonment of lines; certificate required. No carrier by railroad subject to this chapter shall

undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment." (Emphasis supplied.) 49 U.S.C.A. § 1 (18).

cannot differ as to the meaning of its certificate issued pursuant to that opinion. That certificate, similar to the judgment of a court, should control in determining what action the Commission took. As appears from the pertinent part thereof, heretofore quoted, it actually permitted abandonment of operation over the I. C. line conditioned only on the prior commencement of operation over the L & N line. It seems to me that when the Commission thus permitted abandonment of operation over the I. C. line, that order carried with it all of the burdens of operation, including the very substantial burden of its obligation to pay rental and taxes to I. C.

The weighing of public benefits against private injury could be done only by the Commission, and on that question the Commission found: "That on the whole the benefit to the applicant and the public from the proposal will outweigh any injury which may be inflicted thereby on the protesting railroads."

Under the majority decision, it is difficult, if not impossible, to discover any method by which a carrier may be relieved of its obligation under a perpetual lease of operation rights over another's line short of bankruptcy, forced liquidation or dissolution. In the present case, the Commission found that the switch to the lines of the L & N would effect some economy even if the G. M. & O. had to continue its payment of rentals to I. C., though, of course, much greater economy would be effected if such payments ceased. In a case where the economies effected were not so large, would the Commission be powerless to permit the abandonment of that part of the burden of operation? When G. M. & O.'s private contractual obligation to I. C. came to conflict with its public duty to the extent, as found by the Commission, that the benefit to the public outweighed "*any injury which may be* inflicted thereby on the protesting railroad," (Emphasis supplied) it seems to me that the private obligation ceased to exist. See Munn v. People of Illinois, 94 U.S. 113, 125, 24 L.Ed. 77. I agree with the Court of Appeals of Kentucky that,

"* * * while a railroad is a private corporation, yet it is a quasi public agency, and one contracting with it must have contemplated the fact that when public necessity and convenience required the abandonment of a particular part of its line, it would not be bound by a contract to operate that line in perpetuity." Meacham v. Louisville & N. R. Co., 293 Ky. 642, 169 S.W.2d 830, 832.

See, also, Western Pacific R. Co. v. Nevada-California-Oregon Ry., D.C.S.D. Cal., 40 F.2d 731, 733. Surely by making a private contract for a perpetual lease, G. M. & O. and I. C. could not remove that burden of operation over I. C.'s line from the jurisdiction of the Interstate Commerce Commission. As said by Chief Justice Hughes, speaking for the Court in Norman v. Baltimore & O. R. Co., 294 U.S. 240, 307, 308, 55 S.Ct. 407, 416, 79 L.Ed. 885:

"Contracts may create rights of property, but, when contracts deal with a subject-matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them."

It seems to me that the holding of the majority implies a restrictive and unjustifiable construction of the Commission's authority under Section 1(18), footnote 2, supra, contrary to the liberal construction required by the National Transportation Policy, footnote 1, supra.

Central New England Ry. Co. v. Boston & Albany R. Co., 279 U.S. 415, 49 S.Ct. 358, 73 L.Ed. 770, and Regents of University System of Georgia v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363, appear to me to be clearly inapplicable to the facts of this case. In Central New England Ry. Co. v. Boston & Albany R. Co., supra, no permission was requested or granted for abandonment by New England of operations over the Boston & Albany line. Boston & Albany was not even a party to the proceeding before the Commission, nor was it given an opportunity to be heard. As to Regents of

University System of Georgia v. Carroll, supra, it seems to me that the provisions for regulation of radio broadcasting embodied in the Federal Communications Act, 47 U.S.C.A. § 151 et seq., differ radically from those for the regulation of common carriers in the Interstate Commerce Act. See Federal Communications Comm. v. Sanders Brothers Radio Station, 309 U.S. 470, 474, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037. Specifically, the Federal Communications Act contains no provision comparable to paragraph 18 of section 1 of the Interstate Commerce Act, footnote 2, supra, under the authority of which the Commission acted in this case. On the contrary, licensees for radio broadcasting need not renew their license, but may abandon operation without the consent of the Commission.

It seems to me, under the findings, order and certificate of the Interstate Commerce Commission, that upon G. M. & O.'s compliance therewith, any obligation of G. M. & O. to I. C. was extinguished. I, therefore, respectfully dissent.

Rehearing denied: RIVES, Circuit Judge, dissenting.