**In the Matter of CHEYENNE WELLS ELEVATOR CORP., Bankrupt.**

**No. 40006.**

United States District Court
D. Colorado.

March 10, 1966.

John P. Gately, Aurora, Colo., for Arthur Fritton, petitioner on review.

Charles E. Matheson, Denver, Colo., trustee in bankruptcy.

Robert E. Long and Edward Mulhall, Jr., Asst. U. S. Attys., Denver, Colo., for Commodity Credit Corp.

WILLIAM E. DOYLE, District Judge.

This case arises on petitioner Arthur Fritton's request for review of the decision of a referee in bankruptcy in the above-entitled action, Bankruptcy No. 40006. In general Fritton contends that the referee's findings concerning certain withdrawals of wheat from Cheyenne Wells Corporation's wheat storage warehouse by Commodity Credit Corporation during July and September, 1964, are not supported by the evidence, and that the referee's final order of distribution is arbitrary, inequitable and constitutes an abuse of discretion. The narrow issue raised is whether the reasoning of the decision in United States v. Luther, 10 Cir. 1955, 225 F.2d 499, cert. denied, 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956), was properly applied by the referee to the circumstances of this case.

On oral argument Commodity and the Trustee in Bankruptcy opposed Fritton's petition; the case is now ripe for disposition.

The following facts are uncontested and amply supported by the record. On October 2, 1964, Cheyenne Wells, a grain storage warehouse facility, was adjudged bankrupt. Both Commodity and Fritton were depositors of Cheyenne Wells.

On or about April 16, 1964, as a result of a spot check examination by a Commodity representative, it was estimated that there was a shortage of some 20,-000 bushels of wheat at the Cheyenne Wells warehouse. Mr. S. C. Gravely, an auditor for the United States Department of Agriculture, testified before the referee that soon thereafter Commodity issued a suspension "as a result of that examination." A suspension by Commodity suspends future deposits of grain in the suspended facility. However, a suspension does not imply complete rescission of previous contractual obligations with the facility.

Thereafter, on July 4, 1964, Fritton deposited 12,590.33 bushels of wheat in the facility. From July 22 to July 29 Commodity withdrew 66,993.17 bushels of wheat on load orders issued by it; from September 11 to September 19 it withdrew an additional 44,547.83 bushels. A few days later, on September 21, Commodity initiated an audit of the Cheyenne Wells books. On October 2 Cheyenne Wells was declared a bankrupt. Commodity's audit, completed in February, 1965, revealed that Cheyenne Wells had been approximately 30,000 bushels short as of April 30, 1964, and over 32,000 bushels short at the close of every succeeding month up to and including September, 1964. The audit also showed that, with a few minor exceptions, Cheyenne Wells had been in a short position continuously since November, 1960.

In the bankruptcy proceedings Fritton contended, as he does here, that Commodity's July and September withdrawals were advances on Commodity's pro-rata share of the wheat in the facility at the time of the first withdrawal. He argues that as Commodity had knowledge of Cheyenne Wells' short condition, to hold that Commodity in such circumstances may withdraw its wheat on the normal first-come first-served basis grants Commodity an unfair preference over the other joint owners of the common mass who did not have such knowledge. The case of Central States Corp. v. Luther, 10 Cir. 1954, 215 F.2d 38, is relied on for the proposition that all depositors of wheat in a storage facility such as Cheyenne Wells are tenants in common of the common mass. Fritton urges the decision in United States v. Luther, 10 Cir. 1955, 225 F.2d 499, supports his contention that the order of the referee, in failing to consider Commodity's July and September withdrawals as advances on its proportionate share of the wheat in the facility at the time of the earlier withdrawal, fails to accord petitioner his proportionate share.

The referee made the following finding in regard to Fritton's argument:

"8. With regard to the claims for wheat, some of which are represented by warehouse receipt holders and some by holders of scale tickets, the court finds that * * * all wheat claimants are entitled to share pro rata in the proceeds realized from the sale of wheat. * * * The court further finds that, in the absence of any showing of a continuous wheat shortage in the warehouse at the time the withdrawals were made by Commodity * * *, and in the absence of any evidence concerning deposits and withdrawals of wheat during such period by other persons, the reasoning in the case of Luther v. United States, 225 F.2d 816 [sic.] (C.C.A. 10th) is not applicable and the shortage of stored wheat should not be charged back against the actual withdrawals by Commodity. * * * *" (Record, p. 8)

During the hearing on November 18, 1965, the referee made the following observations:

"As I understand the Luther case, the target date, so to speak, had been fixed and was known at the time Commodity Credit withdrew the wheat. It knew that the shortage existed. It knew that there were no further dealings of any kind to be had. And with that knowledge, it withdrew wheat under the common mass theory which clearly belonged to all of the tenants in the mass.

"But I am unable to find that any such situation existed. Mr. Fritton, for example, * * * delivered the grain * * * for which a warehouse receipt was issued. * * It is clear that the amount of wheat on hand in the elevator increased by that amount that day. We are entirely in the dark whether wheat had come in, whether wheat had gone out.

"On that date the warehouse may and could, for all the evidence discloses, have been in a very long position. * * * I don't say that is established, but it is a possibility which, if Mr. Fritton were to recover, must be negatived which the evidence has failed to do."

It is clear that the referee considered *Luther* and found it inapposite to this case. We must decide whether in the light of these facts the *Luther* case can be distinguished and held to be inapplicable.

In *Luther* the Court of Appeals upheld the referee's decision and ruled that Commodity's withdrawal of grain at a time when Commodity *knew* the storage facility was short constituted a partial withdrawal of its proportionate share of the common mass. The evidence in *Luther* consisted of the following pertinent facts. In early September, 1951, a Kansas warehouse examiner examined the books of the storage facility and found a shortage of 132,235 bushels of milo. At about the same time a Commodity auditor found that the facility was short some 10,713,-000 pounds—a greater shortage than the state examiner had uncovered. Subsequent to September 30, 1951, after it had full knowledge of the shortages, Commodity obtained from the facility on loading orders 9,426,780 pounds of milo. No other depositor of milo withdrew any grain after September 30, 1951. A written audit report of a Commodity auditor, dated October 18, 1951, revealed the facility was 88 per cent short. It was alleged, and apparently not contradicted, that Commodity had issued loading orders for shipment of milo prior to learning of the shortages; that Commodity learned of such shortages prior to shipment and caused an audit to be made on October 7, at which time it knew the facility was 88 per cent short in its storage obligations; and that Commodity "induced the Grain Company to give preference to shipments to Commodity" with knowledge that the facility was bankrupt and that the grain shipped did not belong to Commodity.

In evaluating the record, the court made the following pertinent comments:

"Since all of such storage claimants, including Commodity, were tenants in common in the common masses, each was entitled to his pro rata share of the grain in storage on September 30, 1951.

"The evidence clearly established that there was a very large shortage when Commodity issued its shipping orders and received grain out of the common masses in storage after September 30, 1951; that it was impossible for the Grain Company to deliver the full amount of the stored grain owned by the several claimants; and that Commodity knew such facts and induced the Grain Company to deliver grain to Commodity, to the detriment of the interests therein of other claimants. * * [W]hen Commodity received, after September 30, 1951, a portion of its undivided interest in the grain on hand, it was only entitled to receive the remainder of its proportionate interest from the grain remaining in the common masses in storage. To hold otherwise would give Commodity a portion of the grain remaining on hand, which belonged in undivided interests to the other storage claimants. The only way that Commodity could be limited to its proportionate interest of the grain on hand in the common masses on September 30, 1951, was to charge its interest with the amount of grain that was delivered to it out of the short common mass on its shipping orders." 225 F.2d at 505, 506

Two facts are emphasized: that there was a large shortage as of September 30, 1951, and that Commodity induced the facility to ship grain to it with knowledge of such fact. It is not clear why the date of September 30 was selected as the time when the common masses theory should be applied, nor does the opinion reveal the precise dates when the grain was shipped to Commodity. Thus it can only be assumed that the audit ordered by Commodity on October 7 had been completed prior to the date Commodity demanded shipment on its previously filed load orders. As the allegations were only that Commodity had knowledge on October 7, the presence or absence of a verified statement of the facility's short position can not be deemed a controlling fact. The important point was that Commodity knew of the shortage when it demanded shipments.

In the instant case Commodity argues that it merely "suspected" a shortage as early as April 16. However, such suspicion admittedly resulted from an investigation conducted by a Commodity examiner. The "suspicion" was strong enough to warrant the suspension of Cheyenne Wells as a future storer of Commodity grain. In such circumstances we find no legal difference between the "suspicion," which Commodity admittedly had, and verified knowledge. Everything that Commodity knew pointed to a shortage as of the time of withdrawal. Commodity can not be allowed to bury its head or close its eyes. It must be deemed to know that which its investigator had brought to its attention. Commodity's knowledge was as of April 16. There was no reason to suppose that the condition had improved between April and July.

The audit at last showed short positions at the end of every operating month from April to the date of bankruptcy. While it is true Commodity did not have the benefit of such certainty until well after the dates of withdrawal, nothing suggests that Commodity was not generally aware of the poor performance of Cheyenne Wells since the middle of 1960.

The absence of evidence concerning deposits and withdrawals during the months in question does not, as defendant urges, destroy petitioner's case. Petitioner Fritton has clearly demonstrated that a short condition existed over a considerable period of time at Cheyenne Wells, and that at the end of every succeeding month the condition was as severe as when Commodity first learned of a shortage. The only reasonable inference from such evidence, in the absence of data to the contrary, is that at all times subsequent to April 16 Cheyenne Wells was in a short position. Thus the finding that Fritton failed to meet his burden of proof must be overruled, for Fritton has produced sufficient evidence to support his contention that defendant should have known, if it did not know, that Cheyenne Wells was in a short position when the load orders were issued. Under the circumstances it is defendant's, not petitioner's, burden to come forth with facts sustaining the argument that defendant did not have reasonable grounds to believe Cheyenne Wells was short when it withdrew its grain from the facility.

In this light the referee's finding that the principles of *Luther* do not apply here must be rejected. The evidence revealed a continuous shortage at Cheyenne Wells, not only for the months in question, but over a period of years. The absence of daily talleys, or flow sheets, does not refute the conclusions favorable to Fritton to be drawn from the actual evidence, though such additional evidence might support defendant's contention that it did not know of such shortages and had no reasonable basis for such knowledge. It must be concluded that Commodity should have known, if it did not in fact know, that Cheyenne Wells was in a continuous short position. With such implied knowledge, Commodity's action in ordering deliveries must be deemed an attempt to gain an amount of grain in excess of its proportionate interest in the common mass and disallowed under the general principles of the decision in United States v. Luther, supra.

For these reasons, the finding and conclusion of the referee is erroneous. It is therefore,

Ordered that the withdrawals made by Commodity from July 22 to July 29 and from September 11 to September 19, 1964, be, and the same hereby are, deemed withdrawals of Commodity's share in the common mass as of July 22. It is

Further ordered, that any grain received by Commodity in excess of such interest be, and the same hereby is, declared disproportionate, the value of which, as determined by market value on the date of withdrawal, shall be deposited with the Trustee for suitable distribution. It is

Further ordered, that Fritton's interest in the common mass be, and the same hereby is, determined as of July 22, 1964.

Counsel for the parties shall prepare and submit an appropriate judgment.