United States Court of Appeals,

Eleventh Circuit.

No. 96-6736.

FOLSOM METAL PRODUCTS, INC., an Alabama Corporation, Plaintiff-Counter-Defendant-Appellee,

RBOP Tools International Inc., Texas Corporation, Intervenor-Plaintiff-Appellee,

v.

TORUS EQUIPMENT COMPANY, Defendant-Counter-Claimant-Appellant.

May 29, 1997.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV 94-L-988-S SHL), Seybourn H. Lynne, Judge.

Before BIRCH and CARNES, Circuit Judges, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

Torus Equipment Inc. owned all rights to a complex machine used to guard against accidents in certain types of oil drilling, known as a rotating blowout preventer ("RBOP"). In 1990 Torus entered into an agreement with Seal-Tech Division of Folsom Metal Products, Inc., to sell to it "all proprietary rights" to the RBOP. The sale took place. After numerous succeeding events the parties disagreed over Seal-Tech's obligations. Seal-Tech filed this suit seeking a declaratory judgment, and Torus counterclaimed. RBOP Tools International, Inc., a successor in interest to Seal-Tech, intervened. The district court granted summary judgment to Seal-Tech and RBOP Tools and denied Torus's motion for partial summary judgment. We hold that the summary judgments were improvidently entered and vacate and remand for further proceedings.

I.

"Proprietary rights" were described in the Torus/Seal-Tech agreement to include specifications, tools, machines, trade secrets, information and expertise relating to design and manufacture of RBOP's, and improvements in existence or that might be developed in the future. Seal-Tech agreed to pay $50,000 up front (when it received funding for its production of a prototype). A royalty of $50,000 was to be paid in ten equal installments of $5,000, each payment to become due upon Seal-Tech's sale or rental of each of the first ten RBOP's that it sold or leased. Also Seal-Tech agreed to pay for a period of ten years an additional annual royalty determined by a formula derived from its gross receipts from sale or rental of RBOP's and its net profits thereon, up to 5% of gross.

Seal-Tech also agreed to purchase from Torus designated products required in the manufacture or repairs of RBOP's that Seal-Tech sold or rented. The agreement noted that Seal-Tech might require technical assistance and training, which was to be supplied by Torus at prescribed per diem rate plus travel expenses. Both parties agreed that know-how and trade secrets would be kept in confidence, divulged only with written consent of Seal-Tech. Torus agreed that it and its shareholders, officers or directors would not compete in any activity regarding RBOP's. Seal-Tech agreed to be responsible for product liability arising from any RBOP manufactured or repaired by it and to indemnify Torus against such claims.

The agreement contained the following default provision:

ARTICLE 10

*Default and Remedies*

10.1 Material default by either party may include, but is not limited to:

(a) SELLER fails to maintain confidentiality of the RBOP and Technical Know-How and Trade Secrets as provided in ARTICLE 7 or breaches another provision of ARTICLE 7;

(b) Either party ceases to do business, becomes commercially insolvent, or is placed in receivership, or is declared by a competent court to be insolvent or bankrupt. Provided however, in the event SELLER encountering any of such occurances [sic], it is expressley [sic] agreed that such occurrance [sic] shall not relieve PURCHASER of its obligation to pay the portion of the purchase price for the Technical Know-How, Trade Secrets and the Trademark "ROTATING BLOWOUT PREVENTER" and "RBOP" (together with the goodwill associated with such marks) represented by the one-half (1/2) of the New Profit of the Net Profit Percentage as set forth in ARTICLE 3, sub paragraph 3.1(b) hereof;

(c) failure to pay the money due SELLER pursuant to the terms of this Agreement; and

(d) SELLER is in breach of any of its representations or warranties hereunder.

With respect to assignment, paragraph 13.3 provided:

13.3 Assignment. PURCHASER and SELLER are each expressly authorized to transfer their respective rights, title and interest hereunder by way of an assignment or otherwise, as either party deems appropriate, in connection with a sale of their respective business or substantially all of their respective assets, or otherwise.

The agreement also provided that if Seal-Tech failed to pay the up front $50,000 or the succeeding $50,000 royalty, it would transfer back to Torus any rights obtained under the agreement, and any monies paid would serve as liquidated damages toward the $100,000.

II.

In subsequent agreements with Torus and others Seal-Tech was variously described as "Seal-Tech Products Division, Folsom Metal Products, Inc.," and as "Folsom Metal Products, Inc. d/b/a Seal-Tech." For simplicity we will refer to "Folsom," but it must be

kept in mind that the original agreement was in the name of "Seal-Tech, a division of Folsom Metal Products, Inc."

A dispute arose between Torus and Folsom concerning the method of calculating the annual royalty payments to be made to Torus over ten years. Torus sued Folsom for an accounting and for unpaid royalties. In 1993 they entered into a settlement agreement whereby Folsom's obligation for the original $100,000 ($50,000 up front and $50,000 royalties) was recognized. Also, Folsom agreed to pay $110,000 more ($35,000 up front and $75,000 in eighteen monthly installments). Folsom's ten year obligation to pay an additional annual royalty was recognized but the method of computing was changed to basically 5% of Folsom's RBOP sales and rentals.

A year later, in February 1994, Folsom entered into an agreement with Big D Rental & Sales Ltd., a Canadian entity, pursuant to which Big D agreed to purchase for $2,400,000, the entire interests of Folsom in RBOP's, inventory, intangibles, and miscellaneous assets, as well as "any other assets of [Folsom] necessary to operate the Business as a going concern." "[T]he Business" was defined to mean the business presently carried on by Folsom under the tradename and style of Seal-Tech and, in particular the design, manufacture, sale and rental of RBOP's. Included were equipment, tools, accessories, manufactured materials, work in progress, contracts relating to rental, supply and manufacture of RBOP's, and drawing and equipment relating to production. Folsom agreed to use its best efforts to make available to Big D the services of its employees "integral to

operation of the Business." Folsom agreed to manufacture additional RBOP's if ordered by Big D, on a cost-plus basis, and agreed to assist in completing a working prototype of next generation RBOP's. Folsom represented that there were no royalties, license fees, liens or charges, or any other encumbrances in favor of any third party.

By an attached letter Folsom set out that the assets being sold "are those related exclusively to our RBOP business and do not include assets used in our other lines of business such as pipe-threading," and office equipment and furniture and general use items such as fork lifts. The letter recognized that Folsom was granting to Big D the right to use the tradename "Seal-Tech" in connection with the RBOP business.

A schedule attached to the Folsom-Big D agreement listed nineteen RBOP's owned by Folsom and to be transferred to Big D and described the location of each. Another attachment stated that the total purchase price of $2,400,000 was allocated $50,000 to intangibles, $200,000 to inventory of parts, $50,000 to miscellaneous items, and $2,100,000 to the RBOP units owned by Folsom. The purchase price was payable $150,000 in cash and a promissory note for $2,200,000 payable in monthly installments of principal and interest for seven years.[1] The agreement recognized that some RBOP's were "in the field under lease" and provided for apportionment of rental revenue upon closing.

Shortly after the Folsom-Big D agreement was made, Big D

---

[1]The discrepancy between $2,400,000 and the total of $2,350,000 is not clearly explained.

organized a wholly owned subsidiary, Big D Alabama Acquisition Corp., an Alabama corporation, which stepped into Big D's shoes. This was done in order that the transaction would be consummated by an Alabama purchaser to ensure the enforceability of the agreement under Alabama law. Shortly thereafter Big D Alabama transferred its rights to another entity that Big D controlled, RBOP Tools International, Inc. a Texas corporation.

Once the agreements between Folsom and Big D were in effect Folsom took the position that its obligations to Torus for royalties to be paid on receipts from sales and leases of RBOP's would be satisfied by paying to Torus a royalty of 5% of the $2,100,000 Folsom and Big D had agreed upon as the purchase price of Folsom-owned RBOP units sold to Big D, payable as and when Folsom received payments from Big D. Folsom tendered to Torus $8,750, which was 5% of payments Big D had already made. Torus refused the offer. Folsom then filed this suit seeking a declaratory judgment that it was only obligated to pay 5% of the $2,100,000 allocated to sale of its RBOP's to Big D, as payments were received, and that neither Folsom nor Big D had any further obligations to Torus.

Torus answered and counterclaimed. It alleged that it had sold to Seal-Tech the going business consisting of its entire RBOP business. It sought a declaratory judgment that the agreement between it and Folsom had not been terminated. Alternatively Torus asserted that Folsom had committed a material breach of the agreement between them by selling and transferring the entire business of the Seal-Tech division and ceasing to engage in

business relating to RBOP's.

In a four-line order the district court held that the contract provisions in the record were clear and unambiguous and pursuant thereto the motions for summary judgment by Folsom and RBOP Tools were granted. In an eight-line order the court entered a declaratory judgment that Folsom was only required to pay Torus 5% of the $2,100,000 allocated by it and Big D to the purchase price of RBOP units acquired by Big D, as payments were received from RBOP Tools, and that there were no further contract obligations owed to Torus by Big D, RBOP Tools or any other successor in interest to the RBOP units.

## III.

Folsom's position is simple. It agreed to pay 5% royalty on its sale or lease of RBOP units. It sold all its units to Big D in one plenary sale for $2,100,000, and it offers to pay 5% thereof as royalty, as payments are received from Big D's successor. It has no more units to sell or lease, therefore it has no obligation to Torus. This position was accepted by the district court.

It is certain that the agreement between Torus and Folsom is not clear and unambiguous. It is not clear whether Folsom agreed to continue in the business of selling and leasing RBOP's and whether it has defaulted by its transaction with Big D.[2] Article 10 describes a material default to include either party's ceasing to do business. The series of agreements refer repeatedly to what Torus sold and Folsom bought as Torus's RBOP business, and what

_____

[2]Folsom's characterization that it just purchased assets of Torus and not Torus's "Business" of selling and leasing RBOP's is untenable.

Folsom resold as its RBOP business.  In his deposition the sole stockholder of Folsom acknowledged that Folsom is not currently engaged in any business.  Yet despite Article 10, paragraph 13.3 seems to authorize a sale by either party of its "respective business."

Apart from the possibility of default and its consequences as provided by the agreement itself, the issues may be viewed through the lens of impossibility of performance.  It is not unambiguously clear whether Torus had a valid expectation of a ten year royalty on lease proceeds and whether Folsom had made that expectation unattainable by making a plenary sale of all leasable units and walking away from the RBOP business.  Without using the term "impossibility" Folsom is in effect invoking impossibility as a defense to Torus's counterclaim (as well as using it affirmatively as a basis for summary judgment in its favor).  But impossibility cannot be invoked by a party who has made performance infeasible through its own actions. *Restatement (Second) of Contracts* § 261 (1979).  Arguably Torus's expectation or possibility of receiving royalties for ten years on leases is a basic assumption of the contract that has been made unattainable by Folsom's actions in selling out and abandoning "the Business."  *See id.;  see also Gulf, Mobile and Ohio R.R. v. Illinois Cent. R.R.,*  225 F.2d 816 (5th Cir.1955) (GM & O's abandonment of use of Illinois Central's track did not terminate its duty to pay rent under its contract with Illinois Central).

Since the district court held Folsom liable for only 5% as received from RBOP Tools, it did not address whether RBOP Tools, as

successor to Folsom, is liable to Torus.  We have, therefore, not addressed the issue of successorship liability.  That too is for the district court to consider on remand.

The summary judgments in favor of Folsom and RBOP Tools are REVERSED and the case is REMANDED to the district court for further proceedings not inconsistent with this opinion.